# UNITED GAS PIPE LINE CO. *v.* McCOMBS ET AL.

No. 78–17.   Argued February 22, 1979—Decided June 18, 1979*

---

*Together with No. 78–249, *Federal Energy Regulatory Commission* v. *McCombs et al.*, also on certiorari to the same court.

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined, except STEWART, J., who took no part in the consideration or decision of the cases.

*Knox Bemis* argued the cause for petitioner in No. 78–17. With him on the briefs were *W. DeVier Pierson* and *James M.*

*Costan.* *Richard A. Allen* argued the cause for petitioner in No. 78-249. With him on the briefs were *Solicitor General McCree, Deputy Solicitor General Barnett,* and *Howard E. Shapiro.*

*Stanley L. Cunningham* argued the cause for respondents in both cases. With him on the brief were *Philip D. Hart* and *Terry R. Barrett.*†

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Under § 7 (c) of the Natural Gas Act, producers who sell natural gas to pipelines for resale in interstate commerce must obtain a certificate of public convenience and necessity from the Federal Energy Regulatory Commission.[1] Section 7 (b) of the Act obligates these producers to continue supplying gas in the interstate market until the Commission authorizes an "abandonment."[2] The principal issue presented by this case is whether a producer may, consistent with § 7 (b), ever terminate this service obligation without obtaining the agency's express approval.

I

The natural gas involved in this case is produced from a 163-acre tract of land located in Karnes County, Tex., and

---

†*Frederick Moring* filed a brief for the Associated Gas Distributors as *amicus curiae* urging reversal.

[1] 52 Stat. 825, as amended, 15 U. S. C. § 717f (c). See *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672 (1954). Pursuant to the Department of Energy Organization Act, 91 Stat. 565, the regulatory functions at issue here were transferred from the Federal Power Commission to the Federal Energy Regulatory Commission, effective October 1, 1977.

[2] Section 7 (b), 52 Stat. 824, 15 U. S. C. § 717f (b), provides:

"No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment."

known as the Butler B tract. In 1948, the owner of this land, B. C. Butler, Sr., executed an oil and gas lease with W. R. Quin as the lessee. Quin's widow contracted in 1953 to sell petitioner United Gas Pipe Line Co. (United), for a 10-year period, all "merchantable natural gas . . . now or hereafter" produced from the Butler B tract. App. 7A. Because United was an interstate pipeline company, Ms. Quin applied to the Commission for a certificate of public convenience and necessity authorizing this sale. The certificate issued by the Commission contained neither a time limitation nor any designation of the depths from which the gas would be produced.

After United installed gathering facilities on the property and began receiving gas from a well 2,960 feet deep, the Butler B lease was assigned several times. H. A. Pagenkopf eventually obtained the leasehold, and in 1961, he agreed to extend the term of United's gas purchase contract through February 7, 1981. Upon Pagenkopf's application, the Commission issued a new certificate in 1963, authorizing continued service to United under the same terms as the earlier certificate. In March 1966, Pagenkopf assigned the Butler B lease to a group headed by L. H. Haring,[3] and shortly thereafter, the only successful well on the property stopped producing. Haring's operator, Bay Rock Corp., notified United some months later that the existing wells were depleted and no other gas would be available at that time. United replied that it would remove its metering equipment for use elsewhere, but would reinstall the equipment "if, at some future date, you have further gas to deliver to us at the above delivery point, which will be subject to the terms of the above-captioned contract." App. 8A–9A. Despite the Commission's subsequent warning that § 7 (b) required the filing

---

[3] Although Haring advised United that he would apply to the Commission for a successor producer certificate, no application was ever filed. App. to Pet. for Cert. in No. 78–17, pp. A–6 to A–7.

of an abandonment application if no further sales were contemplated, Haring never sought the Commission's authorization for abandoning service to United.[4]

During 1971 and 1972, Haring divided the Butler B leasehold horizontally and vertically, and he assigned to a group headed by respondent McCombs a working interest in the eastern 113 acres of the tract between the depths of 6,500 and 8,653 feet. A few months later, the group acquired a similar interest in the entire Butler B tract from depths of 8,700 to 9,700 feet. Drilling to these deeper horizons, the McCombs group discovered new gas reserves.[5] In 1972, they contracted to sell this gas to respondent E. I. du Pont de Nemours & Co. for industrial uses in intrastate commerce. Upon learning of the renewed production, however, United asserted its rights under the 1953 contract, as extended in 1961, to purchase all gas produced from the property. When the McCombs group rejected this claim, United filed a complaint with the Commission.

The Commission upheld the Administrative Law Judge's determination that the McCombs group could not sell the

---

[4] The Secretary of the Commission wrote Bay Rock in January 1971 that it would be necessary to file an application for permission to abandon service and a notice of cancellation of rate schedule. Id., at A–100 to A–101. This letter also directed the lessee to submit either a copy of any agreement with United canceling the gas purchase contract or a statement from United "indicating its position with respect to the proposed abandonment." Ibid. The Secretary had written a similar letter to Pagenkopf in August 1968, but he, too, failed to respond. Id., at A–97 to A–98.

[5] In addition to the Butler B interests, the McCombs group also owned an interest in an adjoining tract of land. In order to operate both tracts as a single entity, the group "unitized," or combined, their interests in Butler B with those in the corresponding depths of the adjacent tract. As a result, a fraction of the production from each of four successful wells located on the total unitized acreage is attributable to the Butler B leasehold for purposes of the gas purchase contract and the Commission's certificates. Id., at A–8 to A–10. See generally 6 H. Williams & C. Meyers, Oil & Gas Law 2–3 (1977 ed.).

Butler B gas in intrastate commerce, at least through February 7, 1981. Opinion No. 740, App. to Pet. for Cert. in No. 78-17, pp. A-32 to A-33. In particular, the Commission found that the certificates issued to the group's predecessors covered all gas produced from the property, including the reserves discovered in 1971 and 1972.[6] Because these predecessors had commenced deliveries pursuant to the certificates, the Commission ruled that all reserves embraced by the certificates were "dedicated" to interstate commerce and could not be diverted from that market without obtaining the agency's approval under § 7 (b). Noting that it had not authorized abandonment during the 5-year interruption in service, the Commission refused to grant its approval retroactively where, as here, the supply of natural gas was not in fact depleted. Accordingly, the Commission declared the sales in intrastate commerce violative of the Act, and ordered delivery to United of all gas derived from the Butler B leasehold.[7]

---

[6] In determining the scope of Pagenkopf's certificate, the Commission analyzed separately the depths covered and the duration of the obligation to sell gas in interstate commerce. The Commission based its conclusion that the certificates encompassed all reservoirs on the absence of any reference to particular depths in either the applications for certification, which incorporated the contract with United, or in the certificates issued Pagenkopf and Ms. Quin. App. to Pet. for Cert. in No. 78-17, pp. A-29 to A-35. Referring to the same documents, the Commission interpreted Pagenkopf's certificate to encompass all gas produced from wells drilled before the contract's expiration date, even if the gas is extracted after February 7, 1981. *Ibid.* However, the Commission refused to consider whether the certificate also covered gas produced from wells drilled after the contract's expiration date. *Id.*, at A-33, and n. 28; see *Sun Oil Co.* v. *FPC,* 364 U. S. 170 (1960). Since the parties have not challenged here these findings on duration, we express no view on the Commission's ruling concerning production beyond 1981.

[7] The Commission did not address the validity of United's gas purchase contract. McCombs has raised that issue in a separate suit, which is being held in abeyance pending completion of this litigation. *McCombs* v. *United Gas Pipe Line Co.,* No. SA-73-CA-210 (WD Tex., filed Aug. 2, 1973).

A divided panel of the Court of Appeals for the Tenth Circuit set aside the Commission's order. 570 F. 2d 1376 (1978).[8] The court did not dispute the Commission's determination that all gas underlying the Butler B tract had been dedicated to interstate commerce. However, while acknowledging that § 7 (b) expressly requires Commission approval before a producer may withdraw dedicated natural gas from the interstate market, the majority held that "strict compliance" with this requirement was unnecessary here. 570 F. 2d, at 1381. In the court's view, "there was no need for the formality of a Section 7 (b) hearing," *ibid.*, because

> "the abandonment of the service in the instant case was accomplished, as a matter of law, when all of the parties recognized that the then known natural gas reserves were depleted in 1966 followed by failure to provide any service under the certificates for a period of five years during which time there was no evidence of other estimated gas reserves recoverable from the subject leaseholds." *Id.,* at 1382.

In sum, the Court of Appeals considered the facts so clear that the abandonment issue was no longer "within the expertise of the Commission." *Id.,* at 1381. The dissenting judge found this conclusion "directly contrary to the plain terms of § 7 (b)," which mandate approval by the Commission as the sole means of effectuating a valid abandonment. *Id.,* at 1382.

We granted certiorari, 439 U. S. 892 (1978), and now reverse.

## II

Congress could not have been more explicit in establishing Commission approval as a prerequisite for lawful abandon-

---

[8] The Court of Appeals rendered this decision on rehearing after withdrawing an earlier opinion by a different panel. See 542 F. 2d 1144 (1976).

ment of service within its jurisdiction. Section 7 (b) provides:

"No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment." 52 Stat. 824, 15 U. S. C. § 717f (b).

Not only does the statute require companies to obtain the "approval of the Commission . . . after due hearing," but it also prohibits abandonment absent specific findings by the Commission. The language of § 7 (b) simply does not admit of any exception to the statutory procedure.[9]

This plain meaning has been acknowledged in several of our previous decisions. Emphasizing that the Natural Gas Act's fundamental purpose was to assure the public a reliable supply of gas at reasonable prices, the Court noted in *Atlantic Refining Co.* v. *Public Service Comm'n*, 360 U. S. 378 (1959), that once gas has been dedicated to interstate commerce, "there can be *no* withdrawal of that supply from continued interstate movement *without Commission approval*." *Id.,* at 388, 389, 392 (emphasis added). The Court again addressed the neces-

---

[9] Although Congress has recently revised the federal scheme for regulating natural gas, see the Natural Gas Policy Act of 1978, 92 Stat. 3351, that legislation does not affect the outcome of this case. With certain exceptions not relevant here, gas reserves dedicated to interstate commerce before November 8, 1978, remain subject to § 7 (b) of the Natural Gas Act. See §§ 2 (18), 104, 106 (a), and 601 (a) of the Natural Gas Policy Act, 92 Stat. 3354, 3362, 3365, 3409, 15 U. S. C. §§ 3301 (18), 3314, 3316 (a), 3431 (a) (1976 ed., Supp. III); S. Conf. Rep. No. 95–1126, pp. 71–72, 82, 84–85, 123–124 (1978); H. R. Conf. Rep. No. 95–1752, pp. 71–72, 82, 84–85, 123–124 (1978).

sity of obtaining the agency's permission in *Sunray Mid-Continent Oil Co.* v. *FPC*, 364 U. S. 137 (1960). There, the Court upheld the Commission's authority to insist upon issuing permanent certificates of convenience and necessity, reasoning that this power was essential to prevent companies from circumventing the regulatory scheme. For if producers could demand certificates of limited duration, and thereby escape federal regulation when the certificates expire, the abandonment procedures of § 7 (b) would be rendered meaningless. 364 U. S., at 142–144, 148. Of particular importance here, the Court specifically considered the impact that depletion of gas supplies would have on a company's obligation to seek abandonment permission. Approving the Commission's practice of issuing certificates that extend beyond the expected life of a given reserve, the Court stressed:

> "[I]f the companies, failing to find new sources of gas supply, desired to abandon service because of a depletion of supply, they would have to make proof thereof before the Commission, under § 7 (b). The Commission thus, even though there may be physical problems beyond its control, [keeps] legal control over the continuation of service by the applicants." *Id.*, at 158 n. 25.

In short, *Sunray* makes clear that producers must secure Commission approval to abandon service even when there is little or no doubt that gas supplies are exhausted.

This Court expressed a similar understanding of the abandonment provision in *United Gas Pipe Line Co.* v. *FPC*, 385 U. S. 83 (1966), which upheld the Commission's determination that a company had violated § 7 (b) of the Act by unilaterally abandoning jurisdictional facilities to avoid paying increased gas prices. In so holding, the Court reiterated that the "statutory necessity of *prior Commission approval, with its underlying findings, cannot be escaped.*" 385 U. S., at 89 (emphasis added). We reaffirmed this interpretation of § 7 (b) just last Term in *California* v. *Southland Royalty*

*Co.,* 436 U. S. 519 (1978). The lessees in *Southland* had dedicated to interstate commerce gas produced from a particular tract, but, when the lease expired, the lessors to whom the oil and gas rights had reverted arranged to sell the remaining gas in the intrastate market. This Court held that even expiration of the lease did not terminate the obligation to continue selling the gas in interstate commerce. To conclude otherwise, we reasoned, would enable private parties to circumvent the Commission's authority over abandonments. And evasion of federal jurisdiction by this means could not be reconciled with the principle that "[o]nce the gas commenced to flow into interstate commerce from the facilities used by the lessees, § 7 (b) require[s] that the *Commission's permission* be obtained prior to the discontinuance of 'any service rendered by means of such facilities.' " *Id.,* at 527 (emphasis added).

Thus, we have consistently recognized that the Commission's "legal control over the continuation of service," *Sunray, supra,* at 158 n. 25, is a fundamental component of the regulatory scheme. To deprive the Commission of this authority, even in limited circumstances, would conflict with basic policies underlying the Act.

Requiring Commission approval, "after due hearing," permits all interested parties to be heard and therefore facilitates full presentation of the facts necessary to determine whether § 7 (b)'s criteria have been met. Contrary to respondents' assumption, see Brief for Respondents 20–21, the Commission does not automatically approve abandonments whenever production has ceased. Indeed, the agency recently refused to grant an application where the producer had not adequately tested for new gas reserves.[10] Had the lessees in the instant case filed an application for abandonment between 1966 and 1971, United might well have demonstrated that exploration

---

[10] See *Texaco, Inc.,* FERC Docket Nos. G–8820 et al., Order Granting Petition for Reconsideration and Modifying Prior Order (Nov. 1, 1977).

of the leasehold had been insufficient to justify finding "the available supply of natural gas . . . depleted to the extent that the continuance of service [was] unwarranted." § 7 (b). And the Commission might have concluded that production from deeper reserves or other measures to restore service were feasible. Permitting natural gas companies to bypass abandonment proceedings simply because known reserves appear depleted would obviously foreclose these factual inquiries. Consequently, the abandonment determination would rest, as a practical matter, in the producer's control, a result clearly at odds with Congress' purpose to regulate the supply and price of natural gas. See *California* v. *Southland Royalty Co., supra,* at 526–527, 529–530; *Sunray Mid-Continent Oil Co.* v. *FPC, supra,* at 142–147.

Moreover, the obligation to obtain Commission approval promotes certainty and reliability in the regulatory scheme. Knowledge that termination of service is lawful only if authorized by the Commission enables producers, prospective assignees, and other interested parties to determine with assurance whether a particular tract remains dedicated to interstate commerce. In contrast, the Court of Appeals' test for *de facto* abandonment would invite speculation regarding the extent of the Commission's jurisdiction. The confusion that would inevitably result from the lack of clear standards as to when producers must seek Commission approval fortifies our conclusion that Congress intended agency supervision of all abandonments.

### III

Respondents maintain that even if producers must always obtain Commission approval for abandonment, the decision below should nevertheless be affirmed. In their view, the Court of Appeals actually concluded that the Commission had erred as a matter of law by refusing to authorize an abandonment retroactively. Assuming this was the true purport of the decision below, we believe the Court of Appeals lacked

authority to set aside the Commission's order on this ground.

Although respondents urged the agency to authorize an abandonment of service from Butler B, the Administrative Law Judge and the Commission rejected this suggestion in light of the clear evidence that the leasehold was still capable of production. Respondents, however, contend that because Haring acted in good faith in failing to seek agency approval, the Commission was obligated to treat their answer to United's complaint as if it were an abandonment application filed in 1966. Thus, according to respondents, the Court of Appeals was entitled to conclude that the Commission should have ignored the evidence of subsequent production and authorized an abandonment based on the evidence available in 1966.

We need not determine whether § 7 (b) allows the Commission to approve an abandonment retroactively and disregard evidence of subsequent production.[11] For the agency certainly did not abuse its discretion in declining to do so here. Authorizing abandonments retroactively would often deprive interested parties of the opportunity to be heard at a meaningful time and to present evidence on the likelihood of renewing gas production in the future. Thus, the Commission would be required to determine on a hypothetical set of facts what action it would have taken had an application been timely filed. Additionally, the jurisdictional status of all dedicated acreage would become uncertain, since the property would be subject to retroactive Commission pronouncements in the indefinite future. Frequent retroactive action would

---

[11] Respondents contend that the Commission recently approved a retroactive § 7 (b) abandonment in *Arkansas Louisiana Gas Co.*, FPC Docket No. CP76–329 (Mar. 8, 1977). In that case, a certificated pipeline had agreed to sell excess gas, but its supply became depleted in 1971. Although the pipeline did not seek abandonment permission until 1977, the Commission approved the abandonment because the supply of excess gas was still depleted and there was no likelihood of obtaining additional gas. The agency's decision therefore had no retroactive impact.

also undermine the statutory scheme by creating an incentive for producers to delay seeking agency approval in the hope that they could later establish good faith. Given this potential for disruption of § 7 (b)'s approval procedure, we believe it is within the Commission's discretion to reject good faith alone as a sufficient justification for determining whether the evidence available in 1966 warranted granting an abandonment.[12]

## IV

Finally, respondents defend the judgment below on the ground that only the depleted shallow reserves underlying Butler B, as opposed to the newly discovered gas, were subject

---

[12] Relying on four lower court decisions that did not involve § 7 (b), respondents argue that the Commission was required to approve abandonment retroactively here. None of these cases, however, supports respondents' contention that the Commission abused its discretion in this suit. In *Ellwood City* v. *FERC*, 583 F. 2d 642 (CA3 1978), cert. denied, 440 U. S. 946 (1979), and *Niagara Mohawk Power Corp.* v. *FPC*, 126 U. S. App. D. C. 376, 379 F. 2d 153 (1967), the Courts of Appeals found no abuse of discretion in the Commission's decision to give retroactive effect to certain rate schedules and licensing orders. Accordingly, neither decision addresses whether the Commission was *required* to exercise its discretion in this manner. Moreover, retrospective action was taken in *Niagara Mohawk* to prevent the utility from benefiting by its failure to comply with the law, a consideration that militates against granting retroactive approval in the instant action.

*Plaquemines Oil & Gas Co.* v. *FPC*, 146 U. S. App. D. C. 287, 450 F. 2d 1334 (1971), merely held that once the Commission chooses "to regard as being done that which should have been done," *id.*, at 290, 450 F. 2d, at 1337, it must apply this principle consistently within the same case. Finally, *Highland Resources, Inc.* v. *FPC*, 537 F. 2d 1336 (CA5 1976), involved a producer that, relying on a published order of the Commission, failed to submit certain rate applications. After the agency changed its filing requirements, the producer promptly tendered the appropriate papers. The Commission nevertheless refused to give the application retroactive effect. The Court of Appeals set aside this aspect of the Commission's order, holding that a producer should not be penalized for its reliance on the agency's own pronouncements. There was no such reliance, however, in the present litigation. See n. 4, *supra*.

to the approval requirements of § 7 (b). In their view, the deliveries actually made in interstate commerce, rather than the certificates of public convenience and necessity, define the "service" that may not be abandoned without Commission approval. Although deliveries were once made from a reservoir approximately 2,900 feet deep, the "separate and distinct" gas from the deeper reservoirs was never delivered into interstate commerce. Thus, according to respondents, the current production is not subject to the requirements of § 7 (b), even though the certificates of public convenience and necessity cover all reservoirs located on Butler B.[13]

Our prior decisions compel rejection of this narrow statutory interpretation. In *California* v. *Southland Royalty Co.*, we expressly agreed with the Commission that the "initiation of interstate service pursuant to the certificate *dedicated all fields subject to that certificate."* 436 U. S., at 525 (emphasis added). And as the Court emphasized in *Sunray Mid-Continent Oil Co.* v. *FPC,* " 'once so dedicated there can be no withdrawal of that supply from continued interstate movement without Commission approval.' " 364 U. S., at 156, quoting *Atlantic Refining Co.* v. *Public Service Comm'n,* 360 U. S., at 389.[14]

---

[13] Since the Commission and lower federal courts have held that § 7 (b) prohibits abandonment of service without agency approval even where the producer has not obtained a certificate, see, *e. g., Cumberland Natural Gas Co.,* 34 F. P. C. 132 (1965); *Mesa Petroleum Co.* v. *FPC,* 441 F. 2d 182 (CA5 1971), respondents contend that § 7 (b)'s reference to "service rendered" can never be measured by the certificate of public convenience and necessity. See n. 2, *supra.* Respondents, however, misperceive the basis for these decisions. Because a company may not circumvent the regulatory scheme by failing to comply' with the certification requirement, the Commission must, in such cases, rely on sources other than a certificate to ascertain the scope of a dedication in interstate commerce. These cases obviously do not preclude the agency from referring to certificates when they exist.

[14] The agency's decisions have reflected a similar understanding of § 7 (b). For example, in *Cumberland Natural Gas Co., supra,* where the

Applying these principles, the Commission determined that all reserves underlying Butler B were dedicated to interstate commerce pursuant to the certificates it had issued in 1954 and 1963, see *supra*, at 534, and n. 6, and therefore were subject to the requirements of § 7 (b). There being ample factual and legal justification for the Commission's conclusions, see *Sun Oil Co.* v. *FPC,* 364 U. S. 170 (1960), we hold that § 7 (b) requires respondents to continue supplying in interstate commerce all gas produced from the leasehold until they properly obtain permission for abandonment.

· The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEWART took no part in the consideration or decision of these cases.

---

producer had not yet obtained a certificate of convenience and necessity, the Commission held that "dedication of reserves for sale in interstate commerce occur[red] at least as soon as deliveries commenc[ed]" from any part of the 9,000-acre leasehold contractually committed to an interstate pipeline. 34 F. P. C., at 136. Accordingly, the agency required that all gas subsequently produced from the entire dedicated leasehold, even if discovered after the dedication, be sold in interstate commerce until the Commission approved an abandonment. *Id.,* at 136–137. See also *Pioneer Gathering System, Inc.,* 23 F. P. C. 260, 263 (1960); *Murphy Oil Corp.* v. *FERC,* 589 F. 2d 944 (CA8 1978); *Mitchell Energy Corp.* v. *FPC,* 533 F. 2d 258 (CA5 1976).