**OFFICE OF THE CONSUMERS' COUNSEL, STATE OF OHIO,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Columbia Gas of Ohio, Inc., Columbia Gas Transmission Corp., Washington Gas Light Co., et al., Intervenors.

**STATE OF OHIO, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Columbia Gas of Ohio, Inc., Columbia Gas Transmission Corp., Washington Gas Light Co., et al., Intervenors.

Nos. 85–1585, 85–1586.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1986.

Decided Jan. 6, 1987.

As Amended Jan. 6, 1987.

M. Howard Petricoff, Sp. Asst. Atty. Gen., State of Ohio, with whom Robert S. Tongren, Asst. Atty. Gen., State of Ohio, Columbus, Ohio, was on the brief for petitioners, State of Ohio, et al., in No. 85–1586.

Margaret Ann Samuels, Columbus, Ohio, with whom David C. Bergmann, Sandusky, Ohio, was on the brief for petitioners, Office of the Consumers' Counsel, State of Ohio, in No. 85–1585.

John Harris Conway, Atty., F.E.R.C., with whom Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., was on the brief for respondent. Barbara J. Weller and Andrea Wolfman, Attys., F.E.R.C., Washington, D.C., also entered appearances for respondent.

Fredric J. George, with whom Stephen J. Small and H.L. Snyder, Charleston, W. Va., were on the brief for intervenor, Columbia Gas Transmission Corp., in Nos. 85–1585 and 85–1586.

Karen B. Pancost and Gordon M. Grant, Washington, D.C., were on the brief for intervenors, Washington Gas Light Co., et al., in Nos. 85–1585 and 85–1586.

Roger C. Post, Columbus, Ohio, was on the brief for intervenor, Columbia Gas of Ohio, Inc., in Nos. 85–1585 and 85–1586.

Before SILBERMAN and WILLIAMS, Circuit Judges, and JAMESON,* Senior District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

* Of the United States District Court for the District of Montana, sitting by designation pursu-

WILLIAMS, Circuit Judge:

Petitioners seek review of a decision of the Federal Energy Regulatory Commission ("FERC" or the "Commission") authorizing abandonment of a 4.7–mile stretch of natural gas pipeline in Ohio known as D–75W. *Bowman v. Columbia Gas Transmission Corp.*, 31 F.E.R.C. (CCH) ¶ 61,185, *reh'g denied*, 32 F.E.R.C. (CCH) ¶ 61,075 (1985). The proceedings before FERC consisted of a consolidation of two actions. In the first, Steve Bowman and 13 other consumers (the "consumers"), all of whom received gas delivered through D–75W, sought an order compelling Columbia Gas Transmission Corporation ("Columbia") to cease all efforts to terminate service through that line. In the second, Columbia sought FERC's permission under section 7(b) of the Natural Gas Act of 1938 (the "NGA"), 15 U.S.C. § 717f(b) (1982),[1] to abandon D–75W. FERC rejected the consumers' claims that abandonment would be contrary to the public convenience or necessity [2] and granted Columbia's request. It also rejected a separate challenge by the Ohio Department of Development (Energy Division) and the Public Utilities Commission of Ohio (collectively referred to here as "Ohio" or the "state") to aspects of the abandonment order that relate to Ohio's jurisdiction. The consumers and Ohio petition for relief under section 19(b) of the NGA, 15 U.S.C. § 717r(b) (1982). We find no grounds to set aside the order.

*Background*

The disputed stretch of pipeline consists of the 4.3–mile segment of Line D–75 to the west of Harpster, Ohio.[3] D–75 was constructed between 1909 and 1911 by Ohio Fuel Gas Company ("Ohio Fuel"), the predecessor of Columbia, and originally carried gas from Line T–50 eastward to several Ohio towns. Construction of Line D–75 was facilitated by right-of-way agreements with rural consumers, predecessors of the petitioners, who lived between Line T–50 and Harpster. These consumers exchanged easements across their property for the right to receive service directly from the line through what are known as farm taps "[w]hile gas is conveyed through said premises in said pipe line...."[4]

The eastern end of D–75 was connected to a new Ohio Fuel line, Line D, around 1929. Joint Appendix ("J.A.") at 802. For the next four decades D–75 was used to move gas from Line T–50 to Line D, as well

---

ant to 28 U.S.C. § 294(d) (1982).

1. Section 7(b) provides:
   No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

2. The consumers' action also contained a claim that D–75W was in fact a distribution line rather than one used either for interstate transportation of gas or for sales of gas for resale in interstate commerce and thus not subject to FERC jurisdiction. *See* § 1(b) of the NGA, 15 U.S.C. § 717(b) (1982). Evidently the consumers reasoned that such a classification might result in the Public Utilities Commission of Ohio forcing Columbia, under state law, to continue service. FERC rejected this claim and the consumers did not appeal that aspect of its order.

3. The petitioners do not contest the abandonment of the .4–mile segment within Harpster, which is being taken over by Columbia Gas of Ohio.

4. The text of the relevant paragraph of Ohio Fuel's standard agreement is as follows:
   While gas is conveyed through said premises in said pipe line, Grantor shall have the right to purchase gas for domestic use in one dwelling on said premises, subject to the Grantee's rules and regulations and hereby agrees to pay for all gas so delivered at the rate provided in the current established schedule of rate (sic) filed with the Public Utilities Commission of Ohio applicable in the immediate vicinity of the point at which gas is to be delivered to Grantor.... It is understood and agreed that said pipe line is a transportation line and not a distribution line and that whenever said Company, its successors or assignees, shall desire to remove or abandon said line, the Grantor's right to purchase gas therefrom shall cease and terminate.
   31 F.E.R.C. (CCH) ¶ 61,185, at pp. 61,361–62.

as to provide gas to the towns along its path and to the rural consumers. By 1970, Line T–50 had deteriorated, and Ohio Fuel applied for and was granted authorization to abandon it. *Ohio Fuel Gas Co.*, 45 F.P.C. 25 (1971). After the demise of T–50, the company reversed the flow in D–75, feeding gas in at D–75's eastern end and moving it westward. Thus the consumers residing along the 4.3–mile stretch of D–75W west of Harpster were no longer tapping into the vital first stage of D–75, but instead found themselves at the end of the line.

Over time D–75W began to develop excessive leaks. Between 1960 and 1967 Columbia repaired over 400 leaks with magnesium anodes designed to slow deterioration. In the following years it detected fewer leaks, but in the spring of 1983 it discovered 28. J.A. at 787. Columbia determined that the line could no longer be used safely, *id.* at 703–05, and the consumers were informed in June 1983 of its intention to abandon the line, *id.* at 668–77. The consumers started an action in state court, seeking an injunction against abandonment on grounds of the right-of-way agreements. Brief of Petitioner at 15–16. In January 1984, however, the Department of Transportation issued an order requiring Columbia to cease its use of the line because of the safety hazard. *See* J.A. at 666–67. Columbia complied and since February 1, 1984, has not used the line. *See id.* at 621. Of course the Department of Transportation order left in place Columbia's service obligation under the NGA, stemming from the original certification of service. For relief from that obligation, FERC consent is required. *See, e.g., United Gas Pipe Line Co. v. McCombs*, 442 U.S. 529, 99 S.Ct. 2461, 61 L.Ed.2d 54 (1979).

Meanwhile, the consumers' state court action culminated in a settlement. According to its terms, Columbia, at its expense, supplied the consumers with $39,226.16 worth of equipment enabling them to use propane as an alternative fuel. (One consumer incurred expenses of $21,000 to convert a grain dryer, which Columbia apparently will pay for under the order here

reviewed.) Columbia also agreed to pay the difference between the higher cost of propane and the cost of gas until the status of D–75W was resolved. J.A. at 614. The parties stipulated that repair of D–75W west of Harpster would be prohibitively expensive and that replacement of the pipeline with a four-inch plastic pipe would cost $173,000.

### Ohio's Standing

As a preliminary matter, we must determine whether Ohio has standing. Its challenge relates to four points of the Commission's order. First, the state claims that the Commission exceeded its authority to the extent that it authorized abandonment of D–75W not only for interstate transmission and sales for resale but also for local distribution purposes. Brief of Petitioner Ohio at 11–12. Second, it claims that FERC's finding that the line was not engaging in local distribution was not supported by substantial evidence. *Id.* at 12–13. Third, Ohio challenges FERC's findings concerning the relationship of Columbia and its affiliate, Columbia Gas of Ohio ("COH"), and especially the finding that Columbia sold gas to COH for resale to the consumers, rather than, as Ohio would have it, directly to the consumers. *Id.* at 13. Fourth, it challenges FERC's statement that Ohio's jurisdiction over Columbia could not extend beyond rate setting even if it were found that Columbia was selling directly to the consumers. *Id.* at 13–14. The state does not, however, challenge FERC's jurisdiction to authorize abandonment of D–75W for interstate transmission and sale-for-resale purposes or to impose conditions on that abandonment. *Id.* at 11–12.

Section 19(b) of the NGA, 15 U.S.C. § 717r(b) (1982) grants standing to appeal Commission orders to any party aggrieved by those orders. Aggrievement requires a non-speculative harm. As this court has previously said, "To show aggrievement, a plaintiff must allege facts sufficient to prove the existence of a 'concrete, perceptible harm of a real, non-speculative na-

ture[.]'" *North Carolina Utilities Commission v. FERC*, 653 F.2d 655, 662 (D.C. Cir.1981) (quoting *Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 716 (D.C.Cir.1977)).

█ The state has failed to 'allege such facts. At oral argument it emerged that Ohio's main concern was the possible preemptive effect of FERC's order in a future state proceeding, the precise object of which was not revealed. This injury is speculative for section 19(b) purposes. It assumes a number of propositions that have not been established in the record before us, including the state's authority under Ohio law to accomplish its unstated objectives, Columbia's litigation strategy in the event Ohio asserts jurisdiction, and the preclusive effect of FERC's pronouncements in a future action. Any such preclusive effect is improbable. Ohio's challenges relate to FERC's statements or findings that are wholly unnecessary to the decision before it, namely, the release of Columbia from its obligations under the NGA to maintain the disputed service through D–75W. Issue preclusion applies only if the first determination was necessary to the judgment. *See* 1 Restatement (Second) of Judgments § 27 comment *h* (1982). A ruling by this court excising the offending dicta might well violate the rule against advisory opinions, but this is a question we need not decide, since we have determined Ohio did not have standing under section 19(b) to request it.

### The Commission's Opinion

█ Section 7(b) of the NGA requires that the Commission, before authorizing abandonment, find "that the present or future public convenience or necessity permit [sic] such abandonment." The Commission's opinion construed this mandate as primarily requiring it to balance the "needs" of the pipeline against those of the consumers. *See* 31 F.E.R.C. (CCH) ¶ 61,-185, at p. 61,364. In practice, the Commission appeared to regard this balancing as involving mainly a comparison of costs: on the unspoken premise that propane and natural gas constituted energy sources of equal value to the consumers, it considered which could be provided at lower cost. It concluded that propane was cheaper. It therefore decided that abandonment would indeed serve the public convenience and necessity. It also considered some other factors urged by the consumers as bearing upon the public interest, but found them insufficiently supported by the record or of marginal relevance. In addition, however, it modified the administrative law judge's proposed order to provide that Columbia should be required to pay "the full cost" of propane conversion.

### The Cost Comparison

On the premise that natural gas and propane furnish energy service of equal value, it seems clearly within the Commission's authority, under the broad "public convenience and necessity" standard, to elect the least costly. This seems particularly so where, as here, the Commission has neutralized distributional or "fairness" concerns by holding that the pipeline is to bear the cost either way. We first consider the Commission's application of the least-cost test and then examine items identified by the consumers as calling for overriding that test.

The Commission's treatment of the cost issue consists of the following:

The record indicates that it would cost about $173,000 to replace the line with a four-inch plastic pipe.

Under the settlement ... Columbia, at its own expense, has converted 13 of the 14 consumers to propane service at a cost of $39,226.16. One of the consumers has also made expenditures of $21,-000 to convert his grain dryer. The total annual extra cost of propane service to all consumers will be $2,903, ranging from $51 to $355 per consumer, above what regular gas service would have cost.

Thus, it would not be economically feasible to replace line D–75W. The cost

of gas service would greatly exceed the cost of propane service.

31 F.E.R.C. (CCH) ¶ 61,185, at p. 61,365 (footnote omitted).

■ This is hardly sophisticated analysis. It indiscriminately mixes capital costs (those of the new pipeline and of the propane equipment) and the recurring cost of paying the price differential between natural gas and propane. Assuming equivalent expected lifetimes and assuming that construction would occur at the same moment in time, this treatment of the two capital items would seem suitable. The recurrent fuel price differential, however, would seem to require two adjustments before it can properly be added to the capital expense of the propane conversion and then, with that cost, be measured against the capital cost of the pipeline. First, as the differential will recur periodically over the lifetime of the pipeline, the calculation would normally include each recurrence for that lifetime. Second, the fuel differential expenses would normally be discounted to present value.[5] Thus, on these assumptions, the correct comparison would appear to be between (1) the present value of the cost of the pipeline [6] and (2) the sum of the present values of (a) the cost of propane conversion and (b) the differential fuel costs.

The Commission's rather slapdash treatment of this issue, however, is not a ground for setting aside its order. First, the alternative calculus offered by petitioners generated a figure of $150,000 for the cost of propane equipment plus the fuel price differential, still well below $173,000, the uncontested cost of the pipeline. Its adoption by the Commission would not alter the conclusion that propane was cheaper. Second, the likelihood of fundamental error in the Commission's conclusion seems remote. This is especially so as more than $60,000 of the cost of propane conversion was sunk. It would seem proper for the Commission to exclude such costs. Since it was seeking to minimize the value of the resources expended on securing the petitioners an alternative fuel supply, we believe it could correctly focus on new costs, *i.e.*, those that each of the possible alternatives would entail.

### Petitioner's Remaining Objections

The consumers object to the Commission's decision on several additional grounds. (1) The Commission, they believe, gave improper weight to the contracts between them and Columbia.[7] (2) The Commission disregarded various factors that, according to them, create equities in favor of forcing Columbia to maintain service through D–75W. These factors consist primarily of claims that Columbia brought about the deterioration of the pipeline through a deliberate policy of non-repair and misled the consumers about the condition of the pipeline and their con-

5. For example, at a discount rate of 3%, $100 to be paid in 10 years has a present value of $74.40, since that sum, invested at 3%, would yield $100 in 10 years.

6. If the lifetime of the pipeline is indefinite, the period over which the fuel differential should be calculated seems essentially to be perpetuity. This calculation involves finding that principal sum on which the annual interest would equal the annual fuel differential. Thus, at 3%, $100,-000 would fund a perpetual fuel cost differential of $3,000.

7. Petitioners make a related claim that FERC improperly relied upon the consumers' settlement agreement terminating the state court injunction suit, in the face of a provision in the settlement that it should not prejudice plaintiffs in related litigation. In fact, the Commission did not rely on the settlement; it merely observed that Columbia had borne more than $39,-000 in propane conversion costs as a result of the settlement. So it had. That the expenses were incurred pursuant to the settlement did not undermine them as evidence of the costs of propane conversion. In any event, by the terms of § 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1982), we may not consider any objection to an order of the Commission unless it has been raised in the application for rehearing before the Commission. *See FPC v. Colorado Interstate Gas Co.,* 348 U.S. 492, 497–500, 75 S.Ct. 467, 470–72, 99 L.Ed. 583 (1955). Since petitioners failed to raise the settlement issue in their application, we cannot consider it here. *See id.; Consolidated Edison Co. of New York, Inc. v. FERC,* 676 F.2d 763, 778–79 (D.C.Cir. 1982).

tract rights.[8] We believe the Commission adequately disposed of all these claims.

*Contract Claims*

■ As to the contracts, the consumers cite authority establishing that an NGA certificate holder's continuing legal obligation to provide service under that certificate is independent of any contractual obligation. *Columbia Gas Transmission Corp. v. FPC*, 530 F.2d 1056, 1059 (D.C.Cir. 1976); *Transcontinental Gas Pipe Line Corp. v. FPC*, 488 F.2d 1325, 1329 (D.C.Cir. 1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2629, 41 L.Ed.2d 226 (1974). This much is indisputable. But the Commission did not regard the contracts as compelling abandonment. Indeed, nowhere in its opinion does the Commission appear to treat the contracts as providing any material support for its decision on abandonment. Its only reference to them is in connection with the consumers' narrower claim that Columbia misled them as to a possible right to rely on continued gas service (discussed below).

*Equitable Claims*

Before considering the non-repair and deception claims, a general comment about equitable considerations is in order. The Commission successfully separated efficiency concerns (how to provide equal service most thriftily) from distributional or fairness ones (how to accommodate whatever equitable claims the consumers might have). Given (1) the unchallenged premise that natural gas and propane would provide benefits of equal value to the consumers and (2) the Commission's order that Columbia bear "the full cost of conversion to propane service," [9] the Commission could choose the cheaper means of providing energy to the consumers without qualifying its apparent decision to hold them harmless from the costs of termination. Under these circumstances, denial of abandonment on grounds of past misbehavior by Columbia would seem to stretch the Commission's mandate to consider the public convenience and necessity to its farthest limit, or beyond.

The Commission focused its inquiry primarily on the prospective effects of abandonment. This was appropriate in these circumstances. The statutory language refers to "the present or future public convenience or necessity," not to any past actions of an applicant. As this court noted before in the abandonment context, "the Commission quite properly refrained from recriminations and concentration on hindsight...." *Valley Gas Co. v. FPC*, 487 F.2d 1182, 1186 (D.C.Cir.1973).

■ The ultimate location of the burden of any wasteful expenditure by Columbia further draws in question the propriety of punishing it by forcing it to use the more costly means of providing the consumers with energy. In the absence of special proceedings finding imprudence in Columbia's conduct, the unnecessary expense would come to rest on the other purchasers of Columbia's gas (a group, incidentally, not represented here). The cost of any replacement of D–75W would go into Columbia's rate base on completion and, assuming the usual convention of "rolled-in" pricing, would be shared by all users of Columbia's service.[10] Generating a quite useless waste of resources and burdening other consumers seems a peculiar remedy

---

**8.** Petitioners also argue that the Commission's abandonment order was inconsistent with its own precedent in *Ohio Fuel Gas Co.*, 20 F.P.C. 235 (1958), in which the Federal Power Commission conditioned an abandonment on either consent of the rural customers affected or an order by the state utilities commission. Again the claim is barred by petitioners' failure to raise it in their application for rehearing. *See supra* note 7.

**9.** We take this language to mean that Columbia must bear the fuel differential costs as well as propane equipment expenses. Consumers have not raised any issue as to possible ambiguity in the Commission's order, however, so that any complaint they might have, on grounds of the order's failing to place the economic burden on Columbia, is not before us.

**10.** Alternatively, of course, the proposed D–75W replacement could be "incrementally" priced (*i.e.*, charged exclusively to its direct beneficiaries). The petitioners would presumably disfavor this alternative.

for any wrong that Columbia might have done consumers.[11] Yet this is the remedy that the consumers seek.

The consumers' claims regarding deliberate non-repair and misleading conduct are vulnerable on other counts as well, as FERC properly noted. FERC did not decide whether the disrepair claim, if proven, would dictate rejection of Columbia's abandonment application, but it did find that the record did not support the claim. This finding is supported by substantial evidence. The consumers suggest that a decline in the number of repairs on D–75W is evidence of Columbia's irresponsibility and that this irresponsibility resulted in a health hazard. There is ample, though not / uncontroverted, evidence in support of the Commission's conclusion that Columbia performed adequate regular maintenance on D–75W and behaved responsibly once the pipeline had deteriorated past the point of redemption. Columbia presented evidence of its use of magnesium anodes to slow corrosion. J.A. at 713–14; *see also id.* at 207–10. The limited life span of these anodes could explain the reversal of a temporary decline in leaks. *Id.* at 217–18. Columbia also accounted for the apparent decline in repairs by explaining that its method of counting leaks found or repaired changed in 1973; thus what formerly counted as five repairs or more might thereafter count as only one. *Id.* at 711–12. Moreover, the Department of Transportation expressly found that Columbia was in compliance with safety standards at the time it certified that the pipeline was hazardous. *Id.* at 667.

Thus Columbia explained to the satisfaction of the Commission the sudden increase in leaks in D–75W. The Commission apparently regarded Columbia's evidence as overcoming one consumer's testimony that gas leaks on D–75W were ignored, *see id.* at 85–86, and drew no inference of neglect from another's testimony that an operator jokingly warned against too many complaints, *see id.* at 152. We defer to the Commission's judgment as to the weight to be given to such evidence. *See Public Service Commission v. FERC,* 642 F.2d 1335, 1342 (1980), *cert. denied,* 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 189 (1981).

■ The consumers' final contention is that Columbia actively misled them concerning the duration of the service it would provide. The agreements signed by most of the consumers made clear that service would be for a limited period of time and subject to discontinuance when it became necessary to abandon the line. *See J.A.* at 357–90. But two consumers testified that Columbia's representatives assured them in 1962 and 1968 that there was no danger that service would be discontinued in the foreseeable future, even though the company was already contemplating abandonment. *See id.* at 84, 116, 149–50, 173. The administrative law judge appeared to give considerable credence to this testimony. He found, "Much of the evidence points to a certain amount of inducement on the part of COH.... However, whether such actions as advertising and verbal assurances can be imputed to Columbia is another matter." 28 F.E.R.C. (CCH) ¶ 63,032, at p. 65,104 (1984).

The Commission's treatment of these charges in its initial opinion was cryptic, but it examined them more closely in its order denying rehearing (Opinion 232–A). 32 F.E.R.C. (CCH) ¶ 61,075 (1985). It found, "There is no indication that Columbia deliberately attempted to mislead the consumers." *Id.* at p. 61,192. The consumers who claimed to have been misled in 1962 and 1968 had in fact received service until 1984. Thus, FERC observed, "The consumers cannot expect a lifetime guarantee of service on the basis of those statements, particularly when the service agree-

---

11. In pursuit of their general thesis that two wrongs make a right, the consumers argue that their rates have in the past subsidized other customers, and that accordingly it is proper for the Commission to force Columbia (and its other customers) to subsidize them. Whatever merit the petitioners' theory that they subsidized other customers in the past might have, the data on which they rely are plainly insufficient to prove it.

ments clearly provide for the abandonment of that service." *Id.* at pp. 61,192–93.

The Commission's finding is supported by substantial evidence. Insofar as it rests on a determination of the credibility of the witnesses, it deserves substantial deference on review. Insofar as FERC determined that there could be no reasonable expectation of perpetual service in the circumstances, we concur.

Accordingly, the petitions for review of FERC's decision are

*Denied.*