**MOBIL OIL EXPLORATION AND PRODUCING SOUTHEAST, INC., et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 86–4940.

United States Court of Appeals, Fifth Circuit.

Sept. 15, 1989.

Dissenting Opinion Sept. 26, 1989.

Charles M. Darling, IV, Stephen L. Teichler, Washington, D.C., for Mobil Oil Exploration and Producing Southeast, Inc.

Daniel F. Collins, Fern L. McGovern, Washington, D.C., for ANR Pipeline Co.

David J. Muchow, Roger B. Cooper, American Gas Ass'n, Arlington, Va., for American Gas Association.

Mark C. Darrell, William T. Miller, Susan N. Kelly, Washington, D.C., for American Public Gas Ass'n.

William T. Benham, Chicago, Ill., for Amoco Production Co.

R. Gordon Gooch, Washington, D.C., for Anadarko Petroleum Corp.

Harris S. Wood, Norma J. Rosner, Dallas, Tex., for Arco Oil & Gas Co.

Michael E. Riddick, Platt W. Davis, III, David T. Andril, Washington, D.C., J. David Garrett, Shreveport, La., for Arkla Energy Resources.

Frederick Morning, M. Lisanne Crowedye, Crowell & Moring, Washington, D.C., for Associated Gas Distributors.

Kerry R. Brittain, Ft. Worth, Tex., for Champlin Petroleum Co.

James B. Atkin, David J. Evans, Washington, D.C., for Chevron U.S.A. Inc.

Michael L. Pate, Cities Service Oil & Gas Corp., Tulsa, Okl., for Cities Service Oil & Gas Corp.

Daniel F. Collins, Donald C. Shepler, Fern L. McGovern, Shepler & McGovern, Washington, D.C., for Colorado Interstate Gas Co.

Ernest J. Altgelt, III, Conoco, Inc., Houston, Tex., for Conoco, Inc.

Craig R. Burgraff, Robert P. Haynes, III, Harrisburg, Pa., for Consumer Advocate of Penn.

Richard C. Green, Hogan & Hartson, Washington, D.C., for El Paso Natural Gas Co.

John T. Miller, Jr., Washington, D.C., for Elizabethtown Gas Co.

Douglas W. Rasch, Exxon Corp., Houston, Tex., for Exxon Corp.

Jerome Feit (argued), Sol., F.E.R.C., John Conway, Atty., Washington, D.C., for F.E.R.C.

Robert A. Jablon, Scott H. Strauss, Washington, D.C., for Ft. Pierce Utilities Authority.

Richard M. Merriman, Peyton G. Bownan, III, Reid & Priest, Washington, D.C., for Gen. Service Customer Group.

Robert C. Platt, Washington, D.C., for Independent Petroleum Ass'n.

John H. Cheatham, III, Edward B. Myers, Washington, D.C., for Interstate Natural Gas.

J. Richard Tiano, John Myler, Mary Ann Walker, Washington, D.C., Robert C. McHugh, Thomas J. Carroll, III, KN Energy, Inc., Lakewood, Colo., for KN Energy, Inc.

David P. Mudrick, David Black, John K. Rosenberg, Martin J. Bregman, Kansas Power & Light Co., Topeka, Kan., William T. Harkaway, Harvey L. Reiter, Washington, D.C., for Kansas Power & Light Co.

Kenneth J. Neises, Laclede Gas Co., St. Louis, Mo., for Laclede Gas Co.

George H. Rothschild, Jr., Marathon Oil Co., Houston, Tex., Kevin M. Sweeney, Washington, D.C., for Marathon Oil Co.

Thomas C. Gorak, Baltimore, Md., for Maryland People's Counsel.

Glenn W. Letham, Kenneth M. Albert, Washington, D.C., for Memphis Light, Gas, etc.

Jeffrey M. Petrash, James H. Holt, Washington, D.C., for Michigan Consol. Gas Co.

James C. Mordy, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for Midwest Energy, Inc.

Christopher K. Sandberg, St. Paul, Minn., for Minnesota Dept. of Public Services.

John Wyeth Griggs, Birch, Horton, Bittner, Pestinger & Anderson, Washington, D.C., Andrew J. Snider, Asst. Gen. Counsel, Jefferson City, Mo., for Missouri Public Service Com'n.

Kevin M. Sweeney, Carroll L. Gilliam, J. Paul Douglas, Washington, D.C., Robert D. Hawroth, Jay G. Martin, Houston, Tex., for Mobil Oil Corp., et al.

Paul E. Goldstein, Paul W. Malloy, Jerome Mrawca, Andrea Studzinski, Lombard, Ill., for Natural Gas Pipeline Co. and United Gas Pipe Line Co.

George J. Meiburger, Peter C. Lesch, Frank X. Kelly, Gallagher, Boland, Meiburger & Brosnan, Washington, D.C., for Northern Natural Gas Co.

Gene R. Sommers, Minneapolis, Minn., for Northern States Power Co.

Thomas C. Gorak, Md. Office of People's Counsel, Baltimore, Md., for Nat. Ass'n. of State Utility Consumer Avo.

John H. Cary, Northwest Central Pipeline Corp., Tulsa, Okl., for Northwest Central Pipeline Corp.

Margaret Ann Samuels, Anne L. Hammerstein, Office of Consumers' Counsel, Columbus, Ohio, for Office of Consumers' Counsel, State of Ohio.

Lindsey How–Downing, Steven F. Greenwald, San Francisco, Cal., for Pacific Gas & Electric Co.

Raymond N. Shibley, Brian D. O'Neill, Washington, D.C., for Panhandle Eastern Pipeline & Truckline Gas.

Richard E. Powers, Jr., Charles E. Suffling, John M. Hopper, Jr., Washington, D.C., for Pennzoil Co.

Thomas M. Patrick, Chicago, Ill., for Peoples Gas Light & Coke Co.

John L. Williford, Larry Pain, Jennifer A. Cates, Attorneys, Phillips Petroleum Co., Bartlesville, Okl., for Phillips Petroleum Co., et al.

Eugene R. Elrod, Donald H. Smith, Washington, D.C., Robert A. Miller, Jr., Plains Petroleum Co., Lakewood, Colo., for Plains Petroleum Co.

Edward J. Grenier, Jr., Gail S. Gilman, Sutherland, Asbill & Brennan, Washington, D.C., for Process Gas Consumers, et al.

John P. Gregg, Washington, D.C., for Public Service Com'n of Dist. of Columbia.

Richard A. Solomon, David D'Alessandro, Wilner & Scheiner, Washington, D.C., for Public Service Com'n of N.Y.

James R. Lacey, Newark, N.J., for Public Service Elec. & Gas Co.

Janice E. Kerr, J. Calvin Simpson, Michael B. Day, San Francisco, Cal., for Public Utilities Com'n of Cal.

Thomas G. Johnson, Gen. Atty., c/o Shell Oil Co., Houston, Tex., for Shell Offshore, Inc. & Shell Western E & P, Inc.

Glen J. Sullivan, David L. Huard, Douglas Ken Porter, E.R. Island, Los Angeles, Cal., for Southern Cal. Gas Co.

William I. Harkaway, Steven J. Kalish, Washington, D.C., for Southwest Gas Corp.

Don L. Keskey, Henry J. Boynton, Asst. Attys. Gen., Lansing, Mich., for State of Mich. and Michigan Pub. Serv. Com'n.

Charles L. Spann, Dallas, Tex., for Sun Exploration & Prod. Co.

Robert W. Gee, Phyllis G. Rainey, Attys., Tenneco Oil Co., Houston, Tex., for Tenneco Oil Co.

Vincent F. Ewell, Jr., Houston, Tex., for Tennessee Gas Pipeline.

Robert W. Baker, Tenngasco Corp., Houston, Tex., for Tenngasco Corp.

Ralph J. Pearson, Jr., Karen A. Berndt, Attys., Texaco, Inc., Houston, Tex., for Texaco, Inc.

Judy M. Johnson, Vice Pres. & Gen. Counsel, Texas Eastern Transmission Corp., Houston, Tex., for Texas Eastern Transmission Corp.

Clayton G. Smith, Atty., Transcontinental Gas Pipe Line, Houston, Tex., Thomas F. Ryan, Jr., Robert G. Hardy, Andrews & Kurth, Washington, D.C., for Transcontinental Gas Pipe Line Co.

Morton L. Simons, Simons & Simons, Washington, D.C., for Union Gas Systems, Inc.

Albert Sylvia, III, Los Angeles, Cal., for Union Oil Co. of Cal.

Roberta L. Halladay (argued), Morgan, Lewis & Bockius, Washington, D.C., C. William Cooper, Sewickley, Pa., for United Distribution Companies.

Michael E. Small (argued), Gregory Grady, Washington, D.C., for Williams Natural Gas Co.

Before CLARK, Chief Judge, BROWN, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge: *

Petitioners, joint opponents of the Federal Energy Regulatory Commission's Order Nos. 451 and 451–A, seek review by this Court contending that the Commission exceeded the scope of its authority in promulgating those Orders. For the reasons cited herein, we agree and vacate the orders complained of.

## I. AN HISTORICAL PERSPECTIVE

The instant controversy finds its genesis in the enactment of the Natural Gas Act of 1938 (NGA),[1] which was Congress' first attempt to provide a workable system of natural gas regulation. Congress, aware of the regulatory gap precipitated by a lack of state power to control interstate pipelines, undertook efforts to bridge that gap through the enactment of the NGA. The regulatory policies of the NGA, which were basically designed to deal with what was considered the burgeoning monopoly power of the pipelines,[2] had significant effects on the future regulation of the nation's natural gas industry.

The provisions of the NGA called for cost based price ceilings for the "sale in interstate commerce of natural gas for resale."[3] Section 4(a) of the NGA[4] provided that the standard for first sale natural gas pricing would be a "just and reasonable" rate calculated in accordance with traditional public utility method principles. The public utility pricing methodology, which allowed pipelines to recover only their actual costs plus a reasonable rate of return and depreciation, was a consumer oriented approach designed to preclude the possibility of pipeline windfalls. In essence, Congress had, through the pricing provisions of the NGA, chosen consumer protection as the overriding objective in the implementation of the nation's first natural gas regulatory scheme. *See, e.g., FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944) ("The primary aim of [the NGA] was to protect consumers against exploitation at the hands of natural gas companies.").

The Federal Power Commission (the "Commission")[5] was authorized to administer the NGA's provisions. While the Commission initially construed the provisions of the NGA to regulate gas sales at the down-

---

* Judge Brown reserves the right to file a further concurring or dissenting opinion pursuant to Court Policy 15(J).

1. Pub.L. No. 75–688, 52 Stat. 821 (codified in 15 U.S.C. §§ 717–717w (1976)).

2. For a series of Federal Trade Commission Reports documenting the alleged abuses by natural gas companies, including monopoly control over consumer prices, *see* Federal Trade Comm'n, Utility Corporations, S.Doc. No. 92, 70th Cong., 1st Sess. *See also* S. Res. 83, 70th Cong., 1st Sess., 69 Cong.Rec. 3054.

3. NGA § 1(b), 15 U.S.C. § 717(b) (1976).

4. 15 U.S.C. § 717c(a) (1976).

5. Throughout this opinion, the term "Commission" will refer to the Federal Power Commission and its successor, the Federal Energy Regulatory Commission.

stream end of interstate pipelines,[6] the Supreme Court, in *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), directed the Commission to regulate pricing upstream at the wellhead. In so doing, the Supreme Court interpreted the NGA as "[giving] the Commission jurisdiction over the rates of *all* wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company." *Id.* at 682, 74 S.Ct. at 799 (footnote omitted) (emphasis supplied).

Responding to the Supreme Court's directive in *Phillips*, the Commission began regulating rates for individual producers in accordance with the NGA's just and reasonable standards through the application of traditional public utility rate setting principles. Because the Commission initially undertook this task by calculating producer rates on an individualized basis, the Commission soon became unable to keep up with its workload.[7] Accordingly, the Commission shifted from its individualized rate setting scheme to an area rate regulation system whereby producer rates were calculated on the basis of a particular region's average production costs, average investment costs, and average rates of return. *See* Statement of General Policy 61–1, 24 F.P.C. 818 (1960). While the Commission's new regional system preserved the earlier method of calculating prices on the basis of

historical costs rather than projected costs, it established a two-tiered rate structure for each area regulated. The area rates, one for "old gas" and one for "new gas" were governed by a Commission set control date. Wells drilled after the control date were priced at a "new gas" rate and wells drilled before the control date were priced at an "old gas" rate. The new pricing system, known as "vintage pricing" or "vintaging"[8] was based on the theoretical assumption that for gas that was already flowing, "price could not serve as an incentive, and since any price above average historical costs, plus an appropriate return, would merely confer windfalls." *Permian Basin Area Rate Cases*, 390 U.S. 747, 797, 88 S.Ct. 1344, 1375, 20 L.Ed.2d 312 (1968). The Supreme Court, in the *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) affirmed the Commission's area rate system concluding that not only did the Commission's new regional system yield reasonable prices, but that the Commission's prior individualized approach had become unworkable. *Id.* at 777, 88 S.Ct. at 1365.

With the implementation of the two-tiered vintage pricing system, the Commission hoped that its higher "new gas" prices would stimulate the development of new gas reserves while at the same time ensuring continued consumer protection through lower "old gas" prices. Significantly, however, the Commission was empowered only

---

**6.** The Supreme Court, in *Public Service Comm'n of New York v. Mid–Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983), explained that the NGA

authorized rates that were "just and reasonable" within the meaning of [the NGA] by examining whatever costs the pipeline had incurred in acquiring and transporting the gas to the consumer. If the pipeline itself or a pipeline affiliate had produced the gas, the actual expenses historically associated with production and gathering were included in the rate base to the extent proper and reasonable. However, if the pipeline had purchased the gas from an independent producer, *the Commission did not take jurisdiction over the producer to evaluate the reasonableness of its rates; it only considered the broad issue of whether, from the pipelines' perspective, the purchase price was "collusive or otherwise improperly excessive."*

*Id.* at 328, 103 S.Ct. at 3030 (citations omitted) (emphasis supplied).

**7.** The Commission estimated that it would be unable to finish its 1960 workload until 2043. *See* Statement of General Policy 61–1, 24 F.P.C. 818 (1960).

**8.** Under vintaging, natural gas is priced with reference to the date of the sales contract, or as has been the case lately, the date when the gas was first produced. The rate for older vintages is lower than the rate for later vintages. Logically, the difference is explained by the fact that production and development costs were lower when the earlier gas was discovered. The purpose of vintaging is to provide producers with a reasonable, but not excessive, return on their sunk investment. *See, e.g.,* Opinion No. 770, "National Rates for Jurisdictional Sales of Natural Gas," 56 F.P.C. 509, 521 (1976).

to regulate the wellhead price of natural gas to be sold for resale in the *interstate* market. Rates on the *intrastate* market on the other hand remained largely uncontrolled. The result of interstate only regulation was that prices for gas sold on the interstate market were kept relatively low while prices for gas sold on the intrastate market continually rose as demand rose. Natural gas shortages increased as a result of sharp pipeline delivery curtailments on the lower priced interstate market.

In an effort to relieve the disturbing shortages, the Commission abandoned the area rate pricing system in favor of a national rate pricing approach. *See Southern Louisiana Area Rate Proceeding*, 46 F.P.C. 86, 110–111 (1971); *National Rates for Natural Gas*, 51 F.P.C. 2212 (1974) (Opinion No. 699). The new national rate approach applied to gas produced from all wells that were drilled after January 1, 1973, and applied across the board to independent producers, pipelines and pipeline affiliates. Additionally, the Commission, in order to ameliorate production shortages, abandoned its prior pure historical cost based approach in favor of an incentive price approach in order to stimulate development of new reserves. *National Rates for Natural Gas*, 52 F.P.C. 1604, 1615–18 (1974) (Opinion No. 699–H) Concurrently, the Commission abandoned, at least temporarily, vintage pricing.

Albeit well intentioned, the Commission's efforts to correct shortages on the interstate natural gas market were inadequate. Recognizing the need to take action, and after some nineteen months of heated debate between the members of Congress who favored deregulation and those who did not,[9] Congress enacted the Natural Gas Policy Act (NGPA).[10] In the NGPA, Congress gave the Commission power to do what the Commission had been unable to do before—regulate wellhead prices in the intrastate market. As a compromise measure, the NGPA contemplated the eventual deregulation of certain categories of natural gas, provided for the gradual price increase of all categories of natural gas, and authorized Commission regulation of natural gas transportation between interstate and intrastate markets.[11]

The NGPA established a pricing system which was based, in part, on the genre of the gas to be regulated, namely, "old gas", "new gas," and "high cost gas." More specifically, the NGPA set price ceilings on gas depending on when or how the gas was produced. Newer, harder to produce gas commanded higher price ceilings while older gas already under production was pegged with lower price ceilings. Congress had, through the pricing provisions of the NGPA, sought to balance the interests of the consumer by keeping old gas prices low while at the same time encouraging the development of new reserves through incentive pricing.[12]

9. Attempts by those who favored deregulation to enact laws which effect deregulation were numerous, but unsuccessful. The most serious attempt was made during the 84th Congress when both Houses passed H.R. 6645, which would deregulate wellhead prices. 101 Cong. Rec. 11930 (1955) (House vote); 102 Cong.Rec. 2096 (1956) (Senate vote). Then President Eisenhower vetoed the bill on grounds totally unrelated to the merits of deregulation. *See* D. Eisenhower, Pub. Papers 256 (1956).

10. 92 Stat. 3350, (codified in 15 U.S.C. § 3301 *et seq.* (1982)). *See Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409, 420, 106 S.Ct. 709, 715, 88 L.Ed.2d 732 (1986). (Although in enacting the NGPA, Congress moved towards a less regulated natural gas market, Congress expanded in some respects federal control.)

11. The NGPA specified the maximum lawful price which could be charged for "first sales" of gas produced in each of eight enumerated categories of gas. The NGPA also prescribed rules for raising prices each month on "first sale" gas and for passing those price increases down to ultimate purchasers.

12. This Court has previously recognized this delicate balance of interests struck by Congress. In *Pennzoil Co. v. FERC*, 645 F.2d 360 (5th Cir.1981), we noted that the NGPA "adopted an incentive-based approach to rate-setting for gas production, providing substantially higher prices for 'new' gas than was currently available. At the same time, the NGPA provided consumer protection by maintaining lower prices on flowing gas, providing only limited future price deregulation in 1985, and extending price controls to intrastate sales of gas." *Id.* at 367 (footnotes omitted).

Recognizing that for certain categories of gas, the new NGPA price ceilings might be set too low, Congress provided an escape valve for the Commission. NGPA sections 104, 106 and 109 authorized the Commission to raise prices in accordance with traditional NGA "just and reasonable" principles for three particular categories of gas. Similarly, section 110(a)(2) appeared to give the Commission the authority to raise price ceilings for the other five categories of gas enumerated in the NGPA. Congress, however, declined to give the Commission the authority to mandate lower price ceilings than those provided for by the NGPA.

The effects of the NGPA were bittersweet. Clearly, the NGPA's regulatory scheme ameliorated, if not eliminated, the disparity between the interstate and intrastate natural gas markets which existed prior to the passage of the Act. Also, the increased prices provided by the NGPA stimulated increased production of natural gas by providing producers with the incentive to develop additional natural gas supplies. Accordingly, natural gas shortages were alleviated. On the down side, the NGPA's new pricing system created market distortions because it priced categories of natural gas at various levels. Additionally, during the gas shortages of the 1970s and early 1980s, many pipelines entered into take or pay contracts which commanded high prices for large volumes of gas. Later, after the NGPA's provisions had effectively cured earlier shortages, gas became more plentiful and prices became lower. Producers nevertheless continued seeking higher than market prices for gas covered by earlier executed take or pay contracts. As one consequence of higher prices, pipelines had difficulty selling gas.[13] An oversupply resulted along with the inevitable negative economic consequences flowing therefrom. Producers curtailed exploration and development of new reserves. Pipelines were burdened with substantial take or pay obligations. In sum, as a result of all of these circumstances brought on by the implementation of the NGPA, the natural gas market became fraught with distortions.

In an initial attempt to correct these market distortions, the Commission issued a Notice of Inquiry wherein the Commission proposed to increase old gas prices. Notice of Inquiry, *Impact of the NGPA on Current and Projected Natural Gas Markets,* IV F.E.R.C. Stats. & Regs. ¶ 35,512 at 35,-560, 47 Fed.Reg. 19,157 (1982). Specifically, the Commission's attempt in that regard was ultimately abandoned because of congressional opposition. *See* S. Res. 331, 97th Cong., 2d Sess. (1982). Some three years later on November 18, 1985, the Secretary of Energy (the "Secretary"), pursuant to Section 403 of the Department of Energy Organization Act,[14] tendered to the Commission a notice of proposed rulemaking which, in turn, ultimately prompted the Commission's promulgation of Order No. 451. The Secretary, in his proposal, advanced the argument that the Commission's existing pricing scheme for old gas inhibited the production of vast reserves of old gas, encouraged the importation of oil and gas, and promoted higher prices to consumers. Significantly, the Secretary admitted that while legislative decontrol of gas prices would be the optimal solution for the problems caused by the old gas pricing structure, until such time as Congress did institute deregulation of old gas, the initiatives which eventually were embodied in Order No. 451 would provide an interim solution.

After notice and comment rulemaking and a two day public conference, the Commission issued Order No. 451 on June 6, 1986. The Commission, in Order No. 451, had adopted the Secretary's proposal with some modifications. In Order No. 451, the Commission collapsed the vintaging system which had prevailed under the NGPA and applied a replacement cost methodology to set an above market, purportedly "just and reasonable" price ceiling applicable to all categories of old gas. Thus, the Commis-

---

**13.** Other factors also contributed to this circumstance. Among them were warmer temperatures and an economic recession.

**14.** 42 U.S.C. § 7173 *et seq.*

sion had essentially achieved de facto deregulation of old gas.[15] First sellers of section 104 and section 106(a) gas were now able to charge up to the maximum lawful price, if the price were allowable under a contract entered into after July 18, 1986. Additionally, the Commission determined in Order No. 451 that the contractual authority for the increased sales prices of section 104 and section 106(a) gas was to be found in indefinite price escalator clauses present in existing contracts. The Commission, while acknowledging that the new price ceiling exceeded existing market prices, contended that market forces would reduce the actual price paid for old gas to levels consistent with the NGA's consumer protection mandate. Further, the Commission concluded that sections 104(b)(2) and 106(c) of the NGPA gave the Commission sweeping authority to raise old gas prices, and that there was no requirement that the Commission find the present gas prices unreasonable before raising them.[16] Nevertheless, in Order No. 451, the Commission specifically found that the existing pricing scheme with respect to old gas was, in fact, unjust and unreasonable because it contributed to serious market distortions and thwarted gas reserve replacement.[17]

In Order No. 451, and its successor, Or-

---

15. The Commission's new price ceiling greatly exceeded the competitive market price that existed in June 1986, and continues to exceed the competitive market price today. Thus, de facto deregulation of old gas appears to have been the Commission's real goal, and that circumstance is best illustrated by the Commission's decision to base the "old gas" ceiling price on a replacement cost methodology that *"[b]est reflect[ed] the level at which prices would be established if deregulation of old gas were to occur."* Order No. 451 at 95 (emphasis supplied). Moreover, the Commission concedes that it has never before applied a replacement cost methodology to flowing (old) gas.

16. Sections 104(b)(2) and 106(c) of the NGPA are virtually identical and provide that
> ... The Commission may, by rule or order, prescribe a maximum lawful ceiling price, applicable to any first sale of any natural gas (or category thereof, as determined by the Commission) otherwise subject to the preceding provisions of this section, if such price is—
> (A) higher than the maximum lawful price which would otherwise be applicable under such provisions; and
> (B) just and reasonable within the meaning of the Natural Gas Act.

15 U.S.C. §§ 3314(b)(2); *see also* 3316(c) (1982).

The above mention of the Natural Gas Act's "just and reasonable" language refers to the following provisions contained in section 4(a) of that Act:
> All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

15 U.S.C. § 717c(a) (1982).

17. The Commission was driven, in part, by the explicit expectation that the provisions of Order No. 451 would stimulate increased production. In that regard,
> [T]he Commission found most persuasive studies showing that if current old gas prices were held at their present levels, approximately 11 Tcf of old gas reserves would not be produced. The 11 Tcf of old gas reserves not produced as a result of vintaging would have been replaced by higher-priced energy supplies. In part, these incremental supply requirements would be met by foreign imports of both oil and gas and the nation's energy security would thereby be compromised and its trade balance weakened. Regardless of the source of the incremental supplies, however, the nation's energy users would be required to pay more for these incremental supplies than would be necessary.

Order No. 451–A at 18. Other benefits were also expected by the Commission as a result of Order No. 451:
> Producers with old gas reserves will obtain additional revenue for exploration and development of gas reserves. Customers will benefit from increased competition and may pay lower gas prices, free from regional disparities, as they gain access to alternative sources of supply and transportation through Order Nos. 451 and 436. The competitive pressures of a wide-open market may also benefit pipelines with increased throughput and the settlement of take-or-pay disputes with producers in exchange for the pipelines' agreement to pay higher old gas prices. Producers may also be persuaded to renegotiate high-cost gas contracts as old gas prices rise, in order to take advantage of increased marketing opportunities for their gas.

Shoneman & McConnell, FERC Order No. 451: Freedom (Almost) for Old Gas, 7 Energy L.J. 299, 324 (1986).

der No. 451–A,[18] the Commission prohibited the automatic collection of the new higher ceiling price for old gas explicitly acknowledging that the new ceiling would yield unjust and unreasonable prices. Order No. 451–A at 128. To prevent such a result, the Commission provided for a good faith negotiation (GFN) procedure governing price increases.

The GFN process, which can only be initiated by a producer, consists of three steps. Step One allows a producer to request a pipeline to nominate the price at which the pipeline would be willing to continue buying old gas under any existing contract.[19] Step Two requires the pipeline to nominate the maximum price up to the ceiling price it would be willing to pay for the old gas *if it wishes to maintain the contract.* During Step Two, the pipeline also has the prerogative to request the producer to nominate a price at which the producer would be willing to continue sales of *any* gas (old or new) under *any other* existing multi-vintage contracts. Finally in Step Three, the producer has the prerogative to nominate a price for gas covered by the pipeline's Step Two request. During Step Three, the producer then may also request that the pipeline nominate a price for any old gas included in the multi-vintage contracts designated by the pipeline in Step Two.

As seen above, the producer (in Step One) is vested with the unilateral right to initiate the GFN process.[20] In the event that the pipeline (in Step Two) nominates anything less than the new, above market ceiling price for old gas as provided for in Order No. 451, the producer has an addi-

tional alternative: the producer has the unilateral right to terminate the existing sales contract, receive automatic abandonment of the underlying sales obligation, and require the contracting non-open access pipeline to transport the released gas to new purchasers. To exercise its unilateral right to terminate the contract accordingly, the producer must provide the former pipeline purchaser with thirty days notice of contract termination, and must comply with certain requirements governing the subsequent sale of the released gas. In Step Three, if the producer does not nominate a price covered by the pipeline's Step Two request, the pipeline may terminate its purchases of all or part of the gas named in its request.

The joint opponents, petitioners herein, challenged the provisions of Order No. 451 through rulemaking comments and rehearing requests. The petitioners contended that the Commission did not have authority to adopt the Secretary's proposal because it 1) effectively deregulated old gas and eliminated vintaging contrary to congressional intent; and 2) used replacement costs as the starting point for the calculation of the new price ceilings on the old gas. The petitioners additionally asserted that current market conditions, specifically the surplus of natural gas, did not justify the need for such severe measures. Additionally, the petitioners objected to the Commission's failure to effectively address the problem of high cost take or pay contracts in its promulgation of Order No. 451. The petitioners complained that unless the Commission made the problem "take or pay" contracts market responsive, a tremendous

18. Order No. 451–A clarified Order No. 451. For a discussion of those clarifications, *see* Mogel and Mann, Natural Gas: Current Federal and State Developments 16–20 (1987).

19. Order No. 451 defines an existing contract to include an expired contract by which gas is being sold pursuant to an obligation imposed by a certificate of public convenience and necessity. The GFN procedure does not apply to contracts entered into after July 18, 1986, nor does it apply if, after that date, the parties renegotiate the sale price or any other sale terms of old gas under an existing contract. The Commission, on rehearing, did, however, allow for parties to

agree in writing to preserve their rights under the GFN procedure even though an existing contract for old gas was amended after July 18, 1986.

20. Although Order No. 451 became effective on July 18, 1986, a producer could not request pipeline nominations until November 1, 1986. Subsequently, that date was moved to December 18, 1986. Finally, as a result of the issuance of Order No. 451–A on December 15, 1986, the date was again postponed until 30 days after Order No. 451–A was published in the Federal Register.

increase in the old gas price ceiling would exacerbate the already serious problem and would ultimately result in higher consumer prices. Finally, the petitioners assert that the Commission's desire to protect against premature abandonment of certain old gas production and stimulate additional production from certain flowing gas reserves could be achieved through alternative measures and in a far less costly manner.[21]

The Commission rejected the contentions of the petitioners and, on December 15, 1986, the Commission, by a unanimous vote, issued Order No. 451–A denying petitions for rehearing of Order No. 451. Thereafter, petitioners filed for review by this Court of the Commission's Order Nos. 451 and 451–A.

## II. DISCUSSION

The petitioners object to the pricing, abandonment, take or pay and transportation components of Order Nos. 451 and 451–A. We will address each objection in turn.

### A. *Pricing*

■ Perhaps the most salient and controversial provision of Order No. 451 is the Commission's new pricing structure for old gas. In establishing this new pricing structure, which, as mentioned previously, collapses the previous vintage system and sets a single higher than market ceiling price on old gas, the Commission relies on the "just and reasonable" standard articulated in sections 104(b)(2) and 106(c) of the NGPA. The petitioners strenuously argue that the Commission's reliance on sections 104(b)(2) and 106(c) as justification for raising ceiling prices on old gas is misplaced, and assert that the Commission has ignored congressional intent and exceeded its authority by allowing for de facto deregulation of old gas. We are constrained to agree.

An examination of the legislative history of the NGPA reveals that its passage was the result of some nineteen months of heated Capitol Hill debates on the issue of whether the natural gas industry should be deregulated.[22] As discussed above, the

---

21. For example, the petitioners contend that the Commission could have targeted specific old gas reserves rather than raising old gas price ceilings across the board.

22. The following are excerpts from the Congressional record which demonstrate the challenges faced by Congress in resolving the differences of its members concerning decontrol of the natural gas industry and the complex problems involved in resolving the deficiencies of the NGA's regulatory devices.

124 Cong.Rec. S15019–20 (daily ed. Sept. 13, 1978) (remarks of Senator McIntyre).

Mr. President, it is time to resolve the conflict over natural gas pricing policy.... During the debate nearly a year ago, I was against the proposal to decontrol the price of natural gas. Instead, I favored a policy that would have provided incentives to the natural gas industry to bring in more gas, yet at the same time protect consumers from unwarranted increases and the inflationary effects of sudden price increases.

\* \* \* \* \* \*

Clearly, we need a compromise between these two extremes. Clearly, we must establish a Federal policy that protects consumers and at the same time provides assurances and incentives to gas producers. Congress as a whole and the energy conferees have labored for nearly 17 long months to come up with a bill that provides this policy. They have put their collective wisdom into the compromise bill that is now before us.

\* \* \* \* \* \*

It is apparent to all of us that the compromise is not perfect. Some of its flaws are obvious. For example, both the Senate and House passed so-called incremental pricing provisions to protect residential consumers of gas from being hit with the biggest increases. Somehow, the compromise ended up with an incremental pricing provision that protects residential consumers less than either the Senate or House bill.

\* \* \* \* \* \*

And if we defeat this compromise, what policy will we put in its place for the long run? Are we to cave in to full decontrol, which would create about as much new supply as this bill, but at substantially higher cost? That is what the gas lobby is hoping for. That is why they are prowling the halls of Congress. And the other opponents of this compromise—the consumers organizations, whom I count as my friends—they want to defeat the compromise in the hope that the Federal bureaucracy will roll back gas prices and will on its own begin regulating the gas that producers are now keeping in their own states.

But this is Congress' job. The time has come for this body to put aside regional differences and partisan bickering. Both sides of the debate in the Congress have fought hard for

NGPA was Congress' response to natural gas shortages precipitated by the Commission's lack of regulatory authority over the intrastate market. The NGPA, as recognized by the Supreme Court in *Public Serv. Comm'n of the State of New York v. Mid–Louisiana Gas Co.*, 463 U.S. at 331, 103 S.Ct. at 3031, was the result of congressional compromise of two "strong, but divergent" positions with regard to the optimal strategy for stimulating increased production of natural gas without higher consumer prices. As we have previously recognized, the essence of the NGPA compromise was the adoption of "an incentive-based approach to rate-setting for gas production, providing substantially higher prices for 'new' gas than was currently available [while ensuring] consumer protection [through] lower prices on flowing gas, providing only limited future price deregulation in 1985, and extending price controls to intrastate sales of gas." *Pennzoil v. FERC*, 645 F.2d 360, 367 (5th Cir.1981) (footnotes omitted).

In that regard, we are persuaded that Congress deliberately chose to maintain lower old gas prices in order to "[concentrate] the rewards of higher prices where they are most needed—on the development of new, high cost gas" and to elicit "[t]he maximum supply response at a minimum cost to consumers." 124 Cong. Rec.

S.14869 (daily ed. Sept. 11, 1978) (Remarks of Sen. Jackson). Further, remarks made by legislators during the NGPA debates support the conclusion that Congress did not intend for the Commission to abrogate, as Order No. 451 has done, the NGPA prescribed pricing structure. *See, e.g.,* 124 Cong. Rec. 28,884 (1978) (Remarks of Sen. Hart: "[C]onsumers should be protected by regulations which prevent the price of old, inexpensive gas from rising"); 124 Cong. Rec. 28,865 (1978) (Remarks of Sen. Domenici: Elimination of vintaging and deregulation of old gas "not doable" or "ever suggested").

While we do not suggest that the Commission's contentions that the disorder in the natural gas market has resulted, at least in part, from the NGPA's vintage pricing structure which compelled natural gas producers to sell gas at below replacement costs are misguided, we nevertheless are constrained to recognize what we perceive to be a clear congressional intent to preserve the old gas pricing provisions of the NGPA. The Commission contends, that in promulgating Order No. 451, it has preserved the intent of Congress to protect consumers from higher prices. The Commission argues that, even though it has raised the price ceiling for old gas greatly in excess of current competitive market levels, market forces will nevertheless

what each thought was best. We now have before us a gas bill that gives neither side all that it wants. But this compromise does provide certainty; it does provide a unified Federal policy for the first time. It does provide substantial incentives for the production of more domestic natural gas. And at the same time it provides a measure of protection for consumers from sudden and unwarranted price increases.
124 Cong. Rec. S14869 (daily ed. Sept. 11, 1978) (remarks of Senator Jackson).
We a proposing a policy which concentrates the rewards of higher prices where they are most needed—on the development of new, high cost gas.
  *   *   *   *   *   *
We wanted to elicit the maximum supply response at a minimum cost to consumers. ... [i]t also allowed the conferees to achieve a bill that will encourage production while protecting consumers from applying unnecessarily high prices for gas that they could expect to receive at lower prices under current policies.

124 Cong. Rec. H13242 (daily ed. Oct. 14, 1978) (remarks of Rep. Sharp).
What we are proposing to do and asking Members to act upon is not a perfect solution.
  *   *   *   *   *   *
Mr. Speaker, we put the highest incentive where the highest risks are and where the greatest gains might come from. The next highest incentives are where there are new gas supplies and major risks, but we think there are pretty good chances that gas can be found.
We tried to see to it that we were protecting the consumers from paying the highest prices where it was not deserved. We tried to focus those prices incentives where they would do the most good.
For additional discussion of the legislative history behind the NGPA, *see* Note, Legislative History of the Natural Gas Policy Act, 59 Texas L.Rev. 101 (1980).

eventually act to hold old gas prices down. Further, the Commission reasoned that Order No. 451 would cause more old gas to be brought into the market place and that the increased volume of old gas in the market would bring pressure upon the existing sales of high priced new gas and that, as a competitive matter, new gas prices (or quantity of sales) would be reduced. Consequently, according to the Commission, these circumstances would more than offset the increased prices charged for old gas under Order No. 451's new high ceiling.

The Commission, in glossing over the mandates of the old gas pricing provisions of the NGPA, has attempted to rely on a somewhat ingenious application of the plain meaning rule [23] of statutory construction to implement its own scheme through an expansive reading of its authority under NGPA sections 104(b)(2) and 106(c). On rehearing, the Commission's own words betray its logic:

> [T]he Commission recognizes that section 104(b)(1) of the NGPA was intended to directly incorporate the just and reasonable rates, and thus the cost-based prices according to vintage, in effect at the time of the NGPA's enactment. Further, the Commission agrees that Congress considered this provision for old gas prices to be a significant feature of the NGPA's design, intended to mitigate the effects on consumers of allowing higher prices for new gas.... However, ... the Commission [has not] found any legislative history whatsoever on section 104(b)(2), or the virtually identical section 106(c)

and 109(b)(2), that raises any doubt about its plain meaning. If Congress had intended old gas prices to be forever subject to the ceilings in effect when the NGPA was enacted, ... sections 104(b)(2) and 106(c) would not have been included in the NGPA.

Order No. 451–A at 11–12 (footnote omitted). As we view the above language, Congress' intent was, as it has been in the past, to protect the interests of the consumer through the incorporation of a vintaged old gas pricing scheme *"as a significant feature of the NGPA's design." Id.* (emphasis supplied).

We agree with the Commission that Congress did not intend, through enactment of the NGPA, to "render the Commission impotent in effectuating its statutory responsibility to serve the public interest." Respondent's Brief at 33. We are also compelled to observe, however, that Congress likewise did not intend, through enactment of the NGPA, to render the Commission omnipotent. Although sections 104(b)(2) and 106(c) do vest the Commission with the authority to raise the NGPA's ceiling prices in accordance with the "just and reasonable" standards of the NGA, this authority does not translate into unfettered discretion.[24] For the Commission to jettison a "significant feature of the NGPA's design" by abrogating the vintage pricing structure, represents, in our view, an improper exercise by the Commission of its limited authority to raise ceiling prices under NGPA sections 104(b)(2) and 106(c). As such, it is an untenable, albeit arguably

**23.** *See, e.g., FERC v. Martin Exploration Management Co.,* 486 U.S. 204, 108 S.Ct. 1765, 1768, 100 L.Ed.2d 238 (1988) ("The plain meaning of the statute decides the issue presented.") (citation omitted).

**24.** The Commission, in construing §§ 104(b)(2) and 106(c) to authorize the implementation of a new, higher than market ceiling price for old gas and the elimination of the old gas vintaging system, breaks virgin ground. The Commission has previously construed §§ 104(b)(2) and 106(c) far differently and much more narrowly than it does now. Its prior interpretation of §§ 104(b)(2) and 106(c) was to the effect that those provisions are more appropriately interpreted as special relief measures to be utilized in the event that existing congressional ceiling

prices become confiscatory. *See, e.g.,* Order No. 72, "Final Regulations Implementing Section 109 of the Natural Gas Policy Act of 1978," F.E.R.C. Stats. & Reg. (CCH) ¶ 30,135 at 30,965 (1980). Moreover, this Court in *Pennzoil Co. v. FERC,* 645 F.2d 360 (5th Cir.1981), emphasized that FERC has a "narrow[ ] authority to administer the NGPA and to prescribe higher price ceilings only in certain circumstances." *Id.* at 379 (emphasis omitted) (citations omitted).

We also note that if this Court were to uphold the Commission's new ceiling price on old gas, the issue could never be revisited except by congressional action. The NGPA does not allow the Commission to lower natural gas ceiling prices.

meritorious,[25] solution to the problem of market distortion in the natural gas industry. More simply put, the Commission has exceeded the scope of its authority under the NGPA.[26]

### B. *Abandonment*

When Congress enacted the NGPA, it retained, for most "committed or dedicated" natural gas, the abandonment requirements of Section 7(b) of the NGA.[27] Under the Commission's Order No. 451, a producer may, in the event of unsuccessful good faith negotiation, receive automatic abandonment by executing a new sales agreement with a new purchaser and by providing the former pipeline purchaser with at least thirty days notice of contract termination. Thus, the Commission essentially has authorized "pre-granted" abandonment. The controlling regulation, found at 18 C.F.R. § 157.301(b), is captioned "Pre-granted abandonment" and provides that "[a]ny first seller who sells natural gas

under the blanket certificate authority of paragraph (a) of this section is authorized to abandon the sale upon termination of the contract under which the sale is made."

The petitioners argue that the automatic abandonment procedures promulgated by the Commission amount to a flagrant and unacceptable evasion by the Commission of its regulatory responsibilities under Section 7(b) of the NGA. Further, the petitioners argue that by allowing abandonment determinations to "turn on producer discretion" and by precluding pipeline challenge to producer abandonment and subsequent fact-specific Commission review, the Commission has exceeded its authority under the NGA. The petitioners contend that through the blanket abandonment provisions adopted in Order No. 451, the "Commission withdrew its regulatory presence and allowed abandonment [to turn on] virtually absolute unilateral producer discretion, as guided by economic self-interest." Petitioner's Brief at 41.[28] The Commission, on

---

**25.** In *Mid–Louisiana Gas Co. v. FERC,* 664 F.2d 530 (5th Cir.1981), *vacated on other grounds, Public Serv. Comm'n of the State of New York v. Mid–Louisiana Gas Co.,* 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983), this Court remarked that "[t]he Commission's duty is to administer the law Congress passed in light of the purposes for which it was passed. *It is not an agency's prerogative to alter a statutory scheme even if its alteration is as good or better than the congressional one." Id.* at 535 (emphasis supplied). Moreover, the Senate, on Wednesday, June 14, 1989, voted 82–17 in favor of a bill that would lift natural gas price controls on January 1, 1993.

**26.** In further support of its contentions, the Commission argues that its new ceiling price is not really an "across the board" increase because the Commission explicitly declined to allow for an *automatic* rate increase. The Commission points to the good faith negotiation process as a fundamental component of Order No. 451 in support of this argument. The GFN process is, however, itself a source of dispute. During oral argument and on brief, the petitioners urged that the GFN process is unacceptably unilateral in nature, and as such, is unreasonable. The petitioners contend that while ostensibly labeled a negotiating device, the GFN process is more of a mechanism by which a producer can unilaterally rewrite the terms of a sales contract within, of course, prescribed parameters. The petitioners point to the fact that prior to the Commission's issuance of Order No.

451, many parties asked the Commission to allow pipelines as well as producers to initiate the GFN process; the Commission, however, rejected this proposal. Other parties requested authority for greater rights of first refusal for pipeline customers under the GFN process, but the Commission likewise rejected those proposals. In fact, the petitioners contend that every single proposal tendered by the petitioners to make the GFN process a more balanced procedure was denied by the Commission.

**27.** Section 7(b) of the NGA reads as follows:

(b) No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, *after due hearing,* and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

15 U.S.C. § 717f(b) (emphasis supplied).

**28.** In the past, the Commission has stated that "Section 7(b) ... prohibits abandonments through the unilateral decision of particular producers based upon the economic considerations affecting them." *Arkansas Louisiana Gas Co. v. Amarex Inc.,* Opinion No. 798, 58 F.P.C. 1617, 1635 (1977). Yet, it would appear that the pre-authorized abandonment provisions and the

the other hand, cites *Associated Gas Distributors v. FERC*, 824 F.2d 981, (D.C.Cir. 1987), *cert. denied sub nom. Interstate Natural Gas Assoc. v. FERC*, —— U.S. ——, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), for the proposition that there is "no procedural objection to the Commission's identification of circumstances, in an otherwise valid rulemaking, which automatically trigger its approval of abandonment...." *Id.* at 1015 n. 17 (citations omitted).

The petitioners point to the "after due hearing" language of section 7(b) as support for their argument that the Commission is obligated by the plain language of the statute to conduct a case specific review regarding abandonment. The Commission on the other hand contends that pre-granted abandonment in the context of Order No. 451 serves the overall public interest by ensuring that old gas is kept flowing to a willing purchaser. Further, the Commission disputes the petitioners' "after due hearing" argument by citing *Kansas Power & Light Co. v. FERC*, 851 F.2d 1479 (D.C.Cir.1988), for the proposition that, even in abandonment cases, "it is well established that the Commission need not hold an evidentiary hearing when no issue of material fact is in dispute." *Id.* at 1483. The Commission argues that the abandonment provisions of Order No. 451 represent Commission policy that the propriety of abandonment is governed by a balancing of the needs of current gas consumers being served by the gas reserves with the benefits that would be conferred on the natural gas market as a whole if these reserves were released from dedication.[29]

■ The pre-grant of abandonment runs contrary to the instruction of the Supreme Court in *United Gas Pipe Line Co. v. McCombs*, 442 U.S. 529, 99 S.Ct. 2461, 61 L.Ed.2d 54 (1979). In *McCombs*, the Supreme Court reversed a court of appeals' decision which held that, upon depletion of reserves, a producer may abandon sales without obtaining prior Commission approval. The Supreme Court concluded that such abandonment, without prior Commission approval, would, in effect, allow producers to determine when abandonment would be appropriate. This result, the Court reasoned, was inconsistent with congressional intent. The Commission distinguishes the *McCombs* case by noting that in the instant case, prior abandonment approval has, in fact, been granted by the Commission. We are not persuaded, however, that such a distinction is helpful to the Commission's argument. Rather, it appears that the pre-grant of abandonment contemplated by Order No. 451 would, as in the *McCombs* case, allow a producer, for all practical purposes, to control abandonment through the largely one sided GFN procedure.

In *Public Serv. Comm'n of the State of New York v. FPC*, 511 F.2d 338 (D.C.Cir. 1975), the D.C. Circuit emphasized that "[t]here may be reason for the legislature to enact a deregulation for the natural gas industry, but so long as it prescribes a system of regulation by an agency subject to court review the courts may not abandon

---

GFN procedures promulgated by the Commission which are at issue here, would, for all practical purposes, do just that. For the first time, the Commission has placed abandonment authority in the hands of private parties.

**29.** The Commission first equated the public interest with the interest of the "market as a whole" in an abandonment context in *Felmont Oil Corp. and Essex Offshore, Inc.*, Opinion No. 245, 33 F.E.R.C. (CCH) ¶ 61,333 (1985), *reh'g. denied*, Opinion No. 245–A, 34 F.E.R.C. (CCH) ¶ 61,296 (1986), *rev'd and remanded on other ground sub nom. Consolidated Edison of New York v. FERC*, 823 F.2d 630 (D.C.Cir.1987). As the joint opponents point out, however, the *Felmont* case involved limited term abandonment after a case specific hearing. In *Felmont*, the Commission jettisoned the "comparative needs" test which calls for a comparison of the needs of the existing purchaser of the gas with the needs of the particular purchaser that would obtain the gas in the event of abandonment. In its place the Commission adopted a test which compares the needs of the existing purchaser with the needs of the "market as a whole." Nevertheless, the Commission emphasized that such a shift would not eliminate the need for a factual showing sufficient to justify the proposed abandonment, and that fact-specific consideration of the interests of existing beneficiaries of dedicated service, including mitigation of losses to such beneficiaries, would be preserved.

their responsibility by acquiescing in a charade or a rubber stamping of nonregulation in agency trappings." (citations omitted). *Id.* at 354. Accordingly, we are constrained to conclude that, in the instant case, the Commission has abdicated its responsibility under Section 7(b) of the NGA by providing for an across the board, pre-authorized abandonment provision. Surely such abandonment procedure, being altogether in the producer's control and which may be implemented only at the behest of the producer, would be used only when such utilization would serve the producer's economic interest. As the Supreme Court noted in *United Gas Pipeline Corp. v. McCombs*, 442 U.S. 529, 99 S.Ct. 2461, 61 L.Ed.2d 54 (1979), the absence of provisions for factual inquiry into the circumstances of an abandonment allows for the "abandonment determination [to] rest, as a practical matter, in the producer's control, a result clearly at odds with Congress' purpose to regulate the supply and price of natural gas." *Id.* at 539, 99 S.Ct. at 2467 (citations omitted).[30]

## C. *Take or Pay*

The take or pay problem was born during the 1970s when critical shortages of natural gas allowed producers to virtually dictate the terms and conditions of contracts for sale of natural gas to pipelines. During those years, the prevailing thought was that natural gas supply shortages would continue for quite some time and pipelines were frequently unable to procure enough gas to meet consumer demand. As a result, pipelines entered into take or pay contracts which typically required the pipeline to take a specified volume of gas from the producer or, in the event the gas was not taken, pay for the specified volume agreed to be taken but not taken. Additionally, take or pay contracts frequently contained automatic price escalation clauses which obligated the pipeline to pay either the highest price allowed by law or the highest price paid in a specific geographic area.

Pipelines today are faced with a market vastly different from the market in the 1970s. Conditions now are such that numerous pipelines simply are unable, in many circumstances, to take the quantity of gas required by existing take or pay contracts. Additionally, the natural gas market of today is characterized by oversupply, substantially lower rates for natural gas, and competition. Accordingly, pipelines with high liability take or pay contracts must pay prices for natural gas that are substantially in excess of current market prices. The end result is that both interstate and intrastate pipelines are currently burdened with take or pay contracts which potentially threaten their very existence as public utilities. At stake may be the spectre of unacceptable rate increases, of unpredictable price movements and even of the unavailability of gas supply.

The petitioners contend that the Commission effectively ignored take or pay issues in Order No. 451 notwithstanding its obligation to resolve the problem. In Order No. 451, the Commission stated that it "believes that the natural forces of competition will resolve the issues surrounding high cost contracts." Order No. 451 at 76. In further deference to forces outside its ambit of control, the Commission, in Order No. 451, reaffirmed its previous position that "problem contracts are primarily a matter for resolution between the parties involved." (footnote omitted).[31] *Id.* Con-

---

**30.** We note that the Commission's reliance on *Felmont Oil Corp. and Essex Offshore, Inc., supra,* is misplaced. *Felmont* involved limited term abandonments of shut-in gas. Moreover, *Felmont's* limited term abandonments were granted after a case specific evidentiary hearing. Nor are we persuaded by the Commission's assertions that the right to first refusal granted to a pipeline's firm sales customers protects consumer interests. As the petitioners point out, the Commission, in this assertion, fails to take into account that the right of first refusal has no

effect on a pipeline's ability to continue to meet its systemwide obligation to provide adequate supplies of gas at reasonable prices.

**31.** *See* Order No. 436, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Docket No. RM85–1–000, 50 Fed.Reg. 42,408, at 42,462–64 (Oct. 18, 1985); Order No. 436–A, 50 Fed.Reg. 52,217 (Dec. 23, 1985), *vacated by Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir.1987).

tinuing, the Commission emphasized that "[f]or largely *the same reasons expressed in Order Nos. 436 and affirmed in 436-A,* the Commission ... has confidence that the free operation of market forces will provide a resolution of this issue." *Id.* at 76–77 (footnotes omitted) (emphasis supplied).

In *Associated Gas Distributors v. FERC,* 824 F.2d 981 (D.C.Cir.1987), the D.C. Circuit, vacating Order No. 436, rejected the Commission's adoption of the above rationale because it failed to effectively address the take or pay problem. The Court observed that the rationale "reflects questionable legal premises" and fails to meet the requirement of 'reasoned decisionmaking.'" *Id.* at 1023. We agree with the D.C. Circuit and conclude that the Commission's continued inaction on the take or pay problem is regrettable and unwarranted. As the D.C. Circuit remarked, the Commission's failure to take action on the take or pay problem "reflects a pervasive frame of mind of the Commission about a crucial problem in the natural gas industry." *Consolidated Edison,* 823 F.2d at 641–42. It simply cannot and "will not be wished away." *Id.* at 639.

The Commission also takes the position that the provisions of Order No. 451 will serve to facilitate the renegotiation of high cost contracts. In support of that contention, the Commission projects that under Order No. 451, pipelines will be able to offer higher old gas prices in return for reductions in new gas prices, and that contract reformations will thus ensue.[32] We are persuaded, however, by the petitioners' contention that the "producers with the new gas problem contracts and the producers with the old gas contracts differ markedly." Petitioners' Brief at 63 (footnote omitted). More directly, the producers with the least amount of old gas have the largest amount of nonmarket responsive contracts. Additionally, even if a contract provides for the sales of old *and* new gas,

the pipeline would probably not get much benefit at the bargaining table since only one-third of all new gas is contained in the multi-vintage contracts that the pipeline can bring to the table.

Most damaging to the Commission's position, however, is the previously discussed one-sided nature of the GFN process. Surely producers would not initiate the GFN process if by so doing, they ran the risk of giving up more on new gas contracts than they would receive in return for their old gas. As we view the operation of Order No. 451, it would not, as the Commission asserts, alleviate the take or pay problem. Rather, the prospect for exacerbating the take or pay problem runs rampant throughout the provisions of Order No. 451. Accordingly, we conclude that the Commission's inaction on the take or pay problem is based on a rationale which is arbitrary and unsupportable.[33]

#### D. *Transportation*

We turn now to the last component of Order No. 451 which is challenged by the petitioners—the mandatory transportation of released gas. As mentioned previously, Order No. 451 provides that an existing pipeline purchaser, that is not an open access pipeline,[34] must continue to transport any released gas if 1) the pipeline fails to nominate a price in response to the producer's initial request for such nomination, 2) nominates a price less than the highest price as provided for in the escalation provisions of the sales contract, 3) ceases to purchase gas when the first seller fails to submit a timely price nomination, or 4) ceases to purchase gas after rejecting the price nominated by the first seller. As observed by some commentators, this mandatory transportation provision of Order No. 451 appears, at first glance, to impose a common carrier obligation on pipelines in contravention of the Commission's authori-

---

**32.** Order No. 451 at 148.

**33.** The joint opponents recommended a bilaterally initiated GFN process, expansion of renegotiation rights for problem contracts, and a provision for producer refund of take or pay

payments which could no longer be "made up" because of Order No. 451.

**34.** On the date this case was orally argued some 19 out of 21 major pipelines were either open access, or had filed for open access status.

ty under the NGA. *See e.g.*, Mogel, *Transportation and Marketing of Natural Gas* 175 *et seq.* (1985); *see also* Mogel & Gregg, *Appropriateness of Imposing Common Carrier Status on Interstate Natural Gas Pipelines*, 4 Energy L.J. 155 (1983).

The petitioners likewise adopt the position that the mandatory transportation requirements of Order No. 451 amount to nothing more than the imposition of common carrier obligations on natural gas pipelines, and that such obligations are not permitted under the NGA. In support of this position, the petitioners rely heavily on *Florida Power & Light v. FERC*, 660 F.2d 668 (5th Cir.1981), *cert. denied*, 459 U.S. 1156, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1982). In *Florida Power & Light*, the Commission ordered Florida Power and Light Company to file a tariff provision which required the Company to provide transportation to a point beyond that which it had agreed on. While *Florida Power & Light* arose under Sections 205 and 206 of the Federal Power Act, its holding is nevertheless apposite to the facts in the instant case since NGA sections 4 and 5 were patterned after the Federal Power Act and are virtually identical to Sections 205 and 206 of the Federal Power Act. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 346, 76 S.Ct. 373, 381, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956). In reversing the Commission's imposition of common carrier status in *Florida Power & Light*, this Court found that

> [t]he imposition of common carrier status on FP & L, which the orders at issue accomplish, is precisely the authority which the [Federal Power Act] denies the Commission. The legislative history of the [Federal Power Act] makes clear that the Commission lacks the authority to require electric utilities to provide wheeling even on a reasonable request. Ac-

cordingly, we conclude that the Commission lacked statutory authority to issue the orders in question.

*Florida Power & Light*, 660 F.2d at 676 (footnote omitted).

The legislative history of the NGA, when viewed along side its predecessor, the Federal Power Act, leaves little room for doubt that the Commission has exceeded its authority in implementing the transportation requirements of Order No. 451. As the petitioners note, in the first legislation ever undertaken which affected natural gas pipelines, the Interstate Commerce Act of 1906, Congress expressly exempted transporters of natural gas from the definition of common carrier.[35] Later, in 1914, the House rejected a bill which would have imposed common carrier status on the pipelines.[36] Again, in 1935, Congress rejected a bill which would have required pipelines, among others, to transport gas for any person upon reasonable request.[37] As recently as 1978, Congress, in passing the NGPA, specifically precluded the Commission from treating pipelines as common carriers.[38] Even the Commission itself has recognized that the NGA fails to give it the authority to impose common carrier status on pipelines. *See* Order No. 490, "Abandonment of Sales and Purchases of Natural Gas Under Expired, Terminated, or Modified Contracts," III F.E.R.C. Stats. & Regs., Regulations Preambles, (CCH) ¶ 30,797 at 31,036 (1988). ("Pipelines are not common carriers and only have the duty imposed on them by their certificate.") Nevertheless, the Commission here has inexplicably exceeded its authority and essentially made non-open-access pipelines common carriers.

Moreover, the Commission ignored the requirements of the Administrative Procedure Act[39] in promulgating Order No. 451's mandatory transportation require-

---

**35.** Pub.L. No. 59–337, 34 Stat. 584.

**36.** S. 3345 63rd Cong., 2d Sess., 50 Cong.Rec. 5847–49 (1913).

**37.** H.R. 5423, 74th Cong. 1st Sess. 303, 304 (1935). *See also* Hearings Before the Committee on Interstate and Foreign Commerce, House

of Representatives on H.R. 5423, 74th Cong. 1st Sess. 1646 (1935).

**38.** *See* NGPA Section 602(b), 15 U.S.C. § 3432(b).

**39.** 5 U.S.C. § 551 *et seq.*

ment. The Commission's notice failed to request comment on its proposed authority, or lack thereof, to impose common carrier status on pipelines. Because the Commission's failure to do so precluded the presentation of relevant evidence essential to reasoned decisionmaking in this case, we must conclude that the Commission has avoided a fundamental responsibility under the Administrative Procedure Act. *See, e.g., Texaco, Inc. v. FPC,* 412 F.2d 740 (3d Cir.1969). Accordingly, and for the reasons mentioned above, we are constrained to conclude that the Commission has exceeded its authority by imposing common carrier status on non-open-access pipelines through the mandatory transportation requirements of Order No. 451.

## III. CONCLUSION

Having relied on the language, purposes and history of natural gas regulation as evidenced by the provisions of the NGA and the NGPA, we are constrained to conclude that the Commission has, in the promulgation of Order Nos. 451 and 451–A, exceeded its authority as conferred by Congress. Further, while we remain poignantly aware that the problems facing the natural gas industry are numerous and complex, we nevertheless emphasize that Congress alone has the power to do—or authorize the Commission to do—what the Commission has done in Order Nos. 451 and 451–A. We must therefore vacate Order Nos. 451 and 451–A in their entirety; it is so ordered.

VACATED.

JOHN R. BROWN, Circuit Judge, dissenting.

Because the Court:

¶ *Looks* upon the question of (i) pricing (ii) good faith negotiation (iii) first refusal (iv) abandonment and (v) mandatory transportation for new customers as separate, individual issues rather than as integrated parts of a comprehensive solution to the problems of the natural gas business

¶ *Fails* to accord to the Federal Energy Regulatory Commission (FERC) the ex-

pertise which Congress invests in it for broad ranging operational fact conclusions and policy including replacement costs in lieu of historical costs of service

¶ *Undertakes* to decide on its own, the factual validity (invalidity) of long range predictions of the Commission

¶ *Overlooks* specific congressional language giving express legislative authority to raise the price of old gas

¶ *Presumes* to impose on the Commission responsibilities to consider and, once and for all, to solve the vexing problem of Take–or–Pay

¶ *Disregards* the practical necessities in the Commission's determination to permit abandonment of existing contracts after good faith negotiation

¶ *Disregards,* likewise, the practical necessities of requiring mandatory transportation by "open access" pipelines of gas for new customers after good faith negotiations and right of first refusal to existing customers and in effect

¶ *Substitutes* its own judgment for that of the Commission on what Congress has ordained the Commission may do about the grave problems of the natural gas business,

I must respectfully dissent.

### *A Big Single Package*

Following the highest political traditions of this nation, in which the people expect of the President and the Executive Department the initiation of programs and policies affecting matters of great public importance, the action of FERC in the 451 Orders owes much to the Secretary of Energy's December 1985 statement:

The existing price structure for old gas creates a barrier against the *production of tens of trillions of cubic feet of old gas reserves,* even though these reserves are easier and less expensive to produce than other gas sources. The artificially low prices imposed on old gas by the existing price structure prevents us from producing all our economically recoverable old gas supplies. As a result, Americans are consuming gas from more expensive sources, as well as imported oil

and gas, instead of *first consuming inexpensive old gas*. America should produce all it's economical gas resources, but it should produce it's least expensive gas first. The Department estimates that greater recovery of domestic old gas resources would provide the U.S. economy with *economic benefits of over $25 billion during the next decade*. The benefits would result from greater economic efficiency, higher domestic gas production and lower payments for gas and oil imports. (Emphasis added).

This precipitated FERC's initiation of extended proceedings on the problems of the natural gas business including gas surplus and reduced demand, but increasing city/gate prices. The Commission held extended hearings and received written comments from all segments of the gas industry. Thereafter, the Commission, exercising its authority under NGPA §§ 104 and 106 [1] to raise ceiling prices "if just and reasonable within the meaning of the Natural Gas Act," issued the two hundred seventy-four page Order No. 451. (R. 5390–5664).

Sharply abbreviated, Order 451:

Allows producers (first sellers) of old gas to engage in Good Faith Negotiations (GFN) with pipeline purchasers for a higher price up to the newly created ceilings;

allows sellers to terminate existing contracts in the absence of agreement from GFN;

allows existing sellers to terminate and abandon existing contracts where agreement is reached with a new user/purchaser after notice of first refusal.

The result was to collapse the fifteen different "vintage" price categories under NGPA § 104(a) into a single category with the ceiling price pegged to the highest of the vintage rates. Three reasons were expressed. First, valuable supplies of inexpensive old gas were being inadequately developed. The Commission found that raising the ceiling price would have a significant impact allowing "over 11 Tcf [trillion cubic feet] of additional old gas to be recovered." (R. 5414). Second, the Commission determined that vintage prices kept this old gas priced below a competitive market price. The unequal access to low cost old gas resulted in certain consumers and regions obtaining an unfair competitive advantage.[2] Third, in addition to the competitive advantage to some pipelines the rolling-in old gas prices subsidized producers' sales of high-cost gas or price-deregulated gas.

After first determining that since §§ 104(b)(2) and 106(c) expressly authorized the revision of old gas ceiling prices the Commission need not find existing old gas prices unjust and unreasonable in order to change them, the Commission proceeded to find that the existing old gas price structure was unjust and unreasonable because of these distortions and the reserve replacement it engendered. (*See* R. 5460). The Commission then reached this profound conclusion:

> [T]he current problems being experienced in natural gas markets would

---

**1.** Section 104(b)(2):

Ceiling prices may be increased if just and reasonable. The Commission may, by rule or order, prescribe a maximum lawful ceiling price, applicable to any first sale of any natural gas (or category thereof, as determined by the Commission) otherwise subject to the preceding provisions of this section, if such price is—

  (A) higher than the maximum lawful price which would otherwise be applicable under such provisions; and

  (B) just and reasonable within the meaning of the Natural Gas Act.

15 U.S.C. § 3314(b)(2) (1982); *see also* 15 U.S.C. § 3316(c) (1982).

**2.** The Commission found that:

> wide variations in pipeline access to old gas have created huge disparities in the prices consumers pay for gas at the burner-tip around the country. For example, in 1984, the average residential price of gas in Washington, D.C. was $8.05 per Mcf, while the average price in Kansas was $4.49 per Mcf. Kansas is served by KN Energy and Northern Natural, whose old gas "cushions" in 1984 amounted to 65 percent and 47 percent of their wellhead purchases, respectively. On the other hand, Washington, D.C. is served by Transcontinental Gas Pipe Line whose 1984 old gas cushion was only 28 percent of its total purchases.
>
> R. 5414–15.

largely be remedied by collapsing vintages and raising ceiling prices of below-market priced gas.

(R. 5461).

### The Replacement Cost Approach

Pursuing its finding that a price increase for "old gas" was necessary, the Commission determined that any ceiling price should, as closely as possible, approximate the replacement cost of that gas.

After explaining that it had previously used replacement costs, *see* Opinion No. 699–H, 52 FPC 1604, 1631 *aff'd, Shell Oil Co. v. FPC,* 520 F.2d 1061, 1076–77 (5th Cir.1975), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976); and *see* Opinion No. 770, 56 FPC 509, 521, *aff'd, American Public Gas Ass'n. v. FPC,* 567 F.2d 1016, 1033 (D.C.Cir.1977), the Commission concluded:

> It seems clear based on the above-cited judicial precedents that the issues of replacement costs versus historical costs as well as vintage-based versus uniform rates are matters within the Commission's reasonably exercised discretion.

\*    \*    \*    \*    \*    \*

The NGPA provides strong economic support for pricing old gas at the long-run marginal cost of gas, which is equivalent to replacement cost.

(R. 5485).

### Good Faith Negotiations

For natural gas sold under existing contracts having an indefinite price escalator clause, the Commission created a good faith negotiation (GFN) procedure, 18 CFR § 270.201 (1988), under which the producer/seller, to obtain any rate increase, must first request a renegotiation (nomination) of the existing contract price. The purchaser (usually a pipeline) may then accept or reject those terms or proposed alternative prices. The existing purchaser is not obligated to purchase gas it cannot market. If the producer invokes GFN the pipeline/purchaser can require the producer to renegotiate any contracts covering the sale of both vintage (old) gas and high-cost (new or deregulated) gas. *See* 18 CFR § 270.201(b)(2) (1988). The Commission in a reasoned way [3] found that this provision was necessary to balance the operation of GFN and to provide pipelines/purchasers with a means to reduce high-cost gas purchases. The upshot is that if the producer and pipeline/purchaser are unable to agree on new price terms, old gas and mixed contracts can be terminated by either party. On the other hand, if a new price is otherwise mutually agreed upon the sale must continue at the agreed upon price.

### Abandonment and Transportation Provisions

As an essential ingredient of the GFN rule the Commission added two additional provisions to ensure that the old gas continued to reach the market at a fair, negotiated price. First, if a pipeline purchaser fails to respond to the producer's new price nominations and rejects [4] the producer's price to terminate the gas purchase agree-

---

**3.** *See* Order No. 451, p. 185:

> ... the Commission agrees ... that the good faith negotiation rule ... could be unbalanced.... For example, if a contract included both old and other gas, the producer could seek a higher price for the old gas but the purchaser could not seek a lower price for other gas. If the producer was not satisfied with the price nominated by the purchaser for the old gas, the producer could terminate sales of the old gas to the purchaser, sell that gas to a third party, but require the purchaser to continue purchasing the other gas....
>
> In order to cure these inequities in the operation of the good faith negotiation rule ... the Commission will modify the [GFN] rule ... [to] permit the purchaser to seek a lower

price for any gas ... in any contract between the parties which contains some old gas.
(R. 5580–81).

**4.** If the producer rejects the nominated price, the producer would be free to sell all the gas to a new purchaser subject to the right of first refusal on the part of the existing firm customers of the existing purchaser. There would be no required term for the new contract, nor any higher price requirement. Once a new purchaser is found, the producer would be released from all obligations in law and contract to the existing purchaser upon 30 days notice. However, in the interim, the producer would be required to continue to sell the gas to the existing purchaser at the existing contract price. R. 5592, Order No. 451.

ment, "[t]he first seller (producer) is authorized, upon 30–days written notice to the existing purchaser, to abandon the sale of the gas" if it has contracted to sell the gas to a new purchaser. 18 CFR §§ 270.-201(c)(1), (e)(4) and (f)(5) (1988). Such producer abandonment occurs without further Commission action under § 7(b) of the NGA.[5]

The second provision requires that if there is an abandonment of the sale to the pipeline and a sale by the producer of the released gas to others, the pipeline, if not an "open access" pipeline, must continue to transport that gas. 18 CFR § 270.201(a) (1988).

The Commission found:

We conclude that this rule [GFN] should establish reasonable procedures by which gas which is released ... can be transported by pipelines not under Order No. 436.... However, without Commission action, there is no assurance that first sellers will be able to market their released gas unless their existing purchasers have accepted the terms and conditions of Order No. 436. We believe it is essential ... to assure the availability of transportation service irrespective of whether a particular purchaser has or has not accepted the open-access obligations of Order No. 436 ...

to formulate reasonable and fair transportation provisions. (R. 5608–09).

Without access to transportation the GFN process would be insulated from competitive benefits and both producers and pipelines would be restricted in their access to gas supplies released under the rule.

Under the good faith negotiation procedure, the existing pipeline purchaser may choose or not choose to terminate purchases of gas under an existing contract with a producer. As a condition on the pipeline's exercise of these options, the limited transportation authority is reasonably intended to assure that the pipeline's existing customers, especially firm sales customers, have a practical means

of keeping the gas on-system and getting it transported for their use.

\*    \*    \*    \*    \*    \*

In most instances, first sellers would be unable to market released gas to alternative purchasers unless the existing purchaser agreed to transport the gas or is an Order No. 436 transporter. The existing purchaser would have little if any incentive to do so, however, because in the absence of transportation the first seller would have little alternative but to continue selling to the existing purchaser at the current price. The result would frustrate the purposes of this rule and force the first seller to accept a price which we have found to deny both consumers and producers the full benefits of competition and long-term reliable gas service under the NGPA and NGA. We therefore believe that [GFN] would be ineffective ... unless combined with a transportation provision designed to encourage purchasers to negotiate in good faith and to provide first sellers with reasonable access to an alternative market in the event no agreement on pricing is reached.

(R. 5610, 5611–12).

However, newly priced gas must be keyed to the availability of transportation, or the market-responsive benefit of the rule would be lost, and the public interest benefits of the new ceiling prices also lost. It is in this sense that the new ceiling is only just and reasonable in conjunction with the accompanying transportation provision.

(R. 7428).

The Commission also found that while the price of gas might go up from increased old gas prices it would lower prices and increase supply in the long run.

On rehearing the Commission reaffirmed its finding that producer abandonment was in the overall public interest, (R. 7315), and that over the long haul, customers would have better access to supplies of gas if the old gas could get to a willing purchaser. The Commission also reaffirmed its ruling

---

5. If the pipeline is not "open access" such pipeline's firm gas customers "would specifically have a 'right of first refusal'." *See* 18 CFR 270.201(g) (1988).

requiring pipelines to continue to provide transportation. (R. 7419).[6]

### Pricing

The Court's opinion finds FERC's abandonment of vintaging and establishing the new ceiling prices for old gas is contrary to both NGA and NGPA and beyond the statutory powers of the Commission. Cast in this light, the controversy becomes essentially a rate case "to assure an adequate and reliable supply of gas at reasonable prices." *California v. Southland Royalty Co.*, 436 U.S. 519, 523, 98 S.Ct. 1955, 1957, 56 L.Ed.2d 505 (1977), *citing Sunray Mid–Continent Oil Company v. FPC*, 364 U.S. 137, 147, 151–154, 80 S.Ct. 1392, 1398, 1400–1402, 4 L.Ed.2d 1623 (1960) and *Atlantic Refining Co. v. Public Service Commission of New York*, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959). Under the just and reasonable standard, § 5, 15 U.S.C. § 717d, the Commission's approved rate must:

> [R]easonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed and yet provide appropriate protection to the relevant public interests, both existing and foreseeable.

*Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

In setting "just and reasonable" rates the Commission is not "bound to the service of any single regulatory formula," *Permian*, 390 U.S. at 776, 777, 88 S.Ct. at 1364, 1365, and so long as the Commission engages in reasoned decision making under the just and reasonable standard "... it is the result reached not the method employed which is controlling." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). All that is needed is a reasoned basis by the Commission "to assure itself that the Commission has given reasoned consideration" to the relevant factors. *Permian Basin Area Rate Cases*, 390 U.S. at 792, 88 S.Ct. at 1373.

After enactment of NGPA "[t]he aim of federal regulation remains to assure adequate supplies of natural gas at fair prices." *Transcontinental Gas Pipeline Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409, 421, 106 S.Ct. 709, 716, 88 L.Ed.2d 732 (1986).

### NGPA Provides Express Authority to Raise Old Gas Ceiling Prices

By §§ 104 and 106 of the NGPA, Congress could not have been more explicit in authorizing the Commission to raise statutory ceiling prices for committed or dedicated gas sales "if such [higher] price is ... just and reasonable within the meaning of the Natural Gas Act." §§ 104(b)(2)(B) and 106(c), 15 U.S.C. §§ 3314(b)(2)(B) and 3316(c) (1982), *see* note 1, *supra*. This authority applies to any first sale of *any* natural gas subject to § 104(b)(2), 15 U.S.C. § 3314(b)(2) (1982). This means that Congress granted the Commission the express authority to raise the ceiling prices for vintage gas sales. As the Supreme Court described it, "the statute recognizes that the ceiling may be too *low* and authorizes the Commission to raise it whenever traditional NGA principles would dictate a higher price." *Public Service Comm'n of New York v. Mid–Louisiana Gas Co.*, 463 U.S. 319, 333, 103 S.Ct. 3024, 3032, 77 L.Ed.2d 668 (1983) (emphasis in original).

The sweeping nature of this legislative grant is reflected by expressly allowing this authority to be exercised "by rule or order." Exercise of this power is not confined to case-by-case rate making. It is entirely appropriate for it to be used and employed generically.[7] Nor is there any

**6.** In addition to stressing practical necessities and avoidance of frustration of the objectives of GFN the Commission stated:

> By requiring a pipeline to continue to provide transportation for released volumes, the pipeline is prevented from unduly discriminating against the existing seller and harming competition by denying a producer transportation and thereby blocking the benefits of the final rule.

R. 7428.

**7.** In a related context, *see Texas Eastern Transmission Corp. v. FERC*, 769 F.2d 1053, 1061 (5th Cir.1985), *cert. denied*, 476 U.S. 1114, 106 S.Ct.

basis for thinking that Congress intended or demanded that vintage pricing be continued in perpetuity. *Subcommittee on Energy and Power*, 95th Cong., 1st Sess., *Economic Analysis of Natural Gas Policy Alternatives* (Comm. Print 31, 1977) ("Both House and Senate versions would eliminate vintaging of new natural gas.").

Whatever the nuances of expressions by individual members of the Congress in the so-called legislative history, the words of Congress are explicit and decisive. They reflect in no uncertain terms that in enacting NGA, Congress did not mean to adopt a self-defeating statutory scheme which would bar the Commission from raising vintage ceilings when to do so was part of a comprehensive effort "to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." *Atlanta Refining Co. v. Public Services Commission of New York (CATCO)*, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959).

### Commission's Determinations Just and Reasonable Under NGA

The Commission meets its just and reasonable NGA responsibilities when it sets rates to assure that there is "an adequate and reliable supply of gas at reasonable prices" *California v. Southland Royalty Company*, 436 U.S. 519, 523, 98 S.Ct. 1955, 1957, 56 L.Ed.2d 505 (1978). The accepted precedents do not require that "just and reasonable" rate making invariably requires rates pegged to recover only historically-based costs.[8] The choice whether to adopt replacement cost pricing "to put some of the burden of replacing scarce gas supplies on the consumers of flowing gas" is the Commission's to make, *Tenneco Oil Co. v. FERC*, 571 F.2d 834, 840 (5th Cir. 1978), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978), and this Court has affirmed the Commission's choice to do so. *Shell Oil Co. v. FERC*, 520 F.2d 1061 (5th Cir.1975), *cert. denied*,

426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976).

Without implying, as the Court's opinion suggests, that sustaining Order No. 451 would make the Commission *omnipotent* beyond the powers established by Congress, it is clear beyond question that Congress did not by the NGPA intend to render the Commission *impotent* in effectuating its statutory responsibility to serve the public interest. Rather, as the Supreme Court has clearly stated, to achieve the regulatory goal, the Commission must be free "to make the pragmatic adjustments which may be called for by particular circumstances." *Permian Basin*, 390 U.S. at 777, 88 S.Ct. at 1365, *quoting FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942).

Replacement cost pricing does not in any way depart from the NGPA's regulatory scheme. The NGPA introduced a regime of market-based wellhead pricing. As the Commission explained in considerable detail, (R. 5433–5437, 5443–5449, 7207–7212, 7324–7333), providing for renegotiation of old gas sales prices capped by a replacement cost ceiling properly carries out the free market approach reflected in the congressional enactment of the NGPA.

### Overall Impact of Commission's Orders Just and Reasonable

The GFN is in no sense an "across-the-board rate increase." Rather, it affords the purchaser the option to pay or not to pay a higher price, to renegotiate some high-cost ("new") gas prices, and to have the opportunity to cancel gas purchase contracts thus paying no increased rates. GFN is a fundamental part of the 451 Orders assuring, in line with the NGPA pricing approach, that prices reflect the market's needs and that the rates are "just and reasonable."

There is no basis for the contention by protestants that increased lower gas prices will result. The Commission's extended ex-

8. Reliance on *City of Detroit v. FPC*, 230 F.2d 810 (D.C.Cir.1955) and *Bell Oil Corp. v. FPC*, 255 F.2d 548, 553 (5th Cir.) are misplaced. (See R. 7233–37).

1967, 90 L.Ed.2d 652 (1986) "the drafters' choice of the words 'rule or order' ... clearly contemplates the establishment of an industry-wide scheme of reimbursement."

planation, (see R. 5529–5568 and 7283–7306), fully supports the Commission's judgmental conclusion that while prices to some consumers might rise in the short term under the new rules, overall and in the long term prices would be lower than otherwise because of the increased supply of relatively lower-priced old gas into the open market competing with the more expensive, incentive-priced and deregulated gas.[9] This is the sort of expert prediction —"[t]hat 'the increased incentive to compete vigorously in the market would eventually lead to lower prices for all consumers' "—which should be given deference by the courts. *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1008 (D.C.Cir.1987) (citations omitted).

An essential ingredient in this analysis is that wellhead gas is now practically competitive. The Commission affirms:

> The Commission believes, however, that the market for wellhead natural gas sales is workably competitive. In the first place, Congress so found when it enacted the NGPA. Implicit in the removal of the Commission's authority to regulate the price of new gas is a finding that the wellhead market for natural gas is competitive.

(*See* R. 5532).

As this Court stated in *Pennzoil v. FERC*, 645 F.2d 360, 378–79 (5th Cir.1981):

> Contrary to the Supreme Court's assumption in *Phillips Petroleum Company v. Wisconsin*, 347 U.S. 672 [74 S.Ct. 794, 98 L.Ed. 1035] (1954), which subjected gas producers to utility-type regulation under the NGA, Congress apparent-

**9.** The Commission found that:
> under [the] "good faith" negotiation rule, old gas would actually be priced at the prevailing market price or the new ceiling price, so the practical effect of the proposed rule is to provide a price for old gas equal to the market price or replacement cost, *whichever is lower.*
> R. 5487.
> And, as the Commission expressed on rehearing:
> The Commission continues to believe that eliminating vintaging will cause a substantial increase in recoverable reserves of old gas. Furthermore, nothing raised on rehearing causes the Commission to modify its belief that DOE's study predicting an approximately

ly decided that gas producers do not have "natural" monopoly power.

Similarly, in *Transcontinental Gas Pipeline Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409, 421, 106 S.Ct. 709, 716, 88 L.Ed.2d 732 (1986), the Supreme Court stated, "the NGPA reflects a congressional belief that a new system of natural gas pricing was needed to balance supply and demand ... [t]he new federal role is to 'oversee a national *market price* regulatory scheme.' " (Emphasis added).

Nor is there any basis for the contention that the Commission "assumed" away the problem of uneconomical contracts or the existence of a present gas market surplus. The Commission in a reasoned way reached the view that the 451 Orders, by increasing the competition for low-cost gas and by providing pipelines, through the GFN, with the power to require producers seeking higher old gas prices to renegotiate high-cost gas sales in mixed contracts, would blunt the force of uneconomic contracts.

### Producer Abandonment and Mandatory Transportation: Proper Exercise of Statutory Authority

This is really at the heart of the goals of Order No. 451. As the Commission explains, Order No. 451 would be a meaningless exercise if, despite the Commission's finding that the vintage pricing system was unjust and unreasonable, pipelines with dominant market power could nevertheless effectively nullify GFN and shut in the gas or otherwise prevent increased supplies from reaching the market at a competitive price.[10]

11 Tcf increase is the most convincing analysis in the record of that increase.
R. 7262.

**10.** The Commission said:
> As the Commission stated in Order No. 451, abandonment under the good faith negotiation rule is in the public interest, since it is necessary to ensure that the goals of Order No. 451 of increased production of old gas and overall lower prices described ... are achieved. These goals cannot be achieved unless producers can obtain the market-responsive prices permitted by the rule. Without the possibility of abandonment, purchasers under existing contracts could prevent

The GFN does not, as claimed, empower a producer unilaterally to abandon old gas sales. A producer may abandon only if: (1) the GFN process does not work and the pipeline signals its intent not to purchase the gas at a mutually agreed price; *and* (2) the producer has contracted to sell the gas to a new purchaser. 18 CFR §§ 270.-201(c)(1); (e)(3) and (4); and (f)(5) (1988).

The rule, circumscribed as it is with protective conditions, reflects the Commission's determination that it is in the overall public interest that the old gas continue to flow to a willing purchaser. (R. 7314–7320).

Nor, as this Court's opinion asserts, does § 7(b) of the NGA condemn this streamlined abandonment procedure so obviously demanded by practical necessities. The language of § 7(b) does not require that the Commission act on such matters only case-by-case. Nor does any such right arise by implication from the "due hearing" requirement of § 7(b). *See Kansas Power and Light Co. v. FERC,* 851 F.2d 1479 (D.C.Cir.1988). And, as the D.C. Circuit declared in its monumental *Associated Gas Distributors v. FERC,* 824 F.2d 981, 1015, n. 17 (D.C.Cir.1987), case, there is "no procedural objection to the Commission's identification of circumstances ... which automatically trigger its approval of abandonment" since the law has long recognized that the Commission may act generically when the situation warrants. *See, e.g., Permian Basin Area Rate Cases,* 390 U.S. at 774–77, 88 S.Ct. at 1365.[11]

The public interest is clearly served by these hedged-in conditions. First, the Commission found "generally a purchaser's loss of gas under abandonment provisions of

the good faith negotiation rule should not cause it, *or the market it serves,* to experience a shortage of supply." (R. 7318). (Emphasis added). With open access pipeline transportation and mandated transportation by non-"open access" pipelines and the right of first refusal accorded the purchaser's firm customers over any released gas, customers are assured access to sufficient supplies at reasonable prices now and into the future. (R. 7318–19).[12] To this is added the significant requirement that abandonment under GFN is permissible only when there is a particular new customer who has contracted to take the gas at a market responsive price which assures that the gas will get to the market.

*Mandatory Transportation Lawful*

Under the rules established in the 451 Orders, an interstate pipeline not subject to "open access" regulations that stops purchasing the producer's gas "must transport any gas released due to termination or abandonment" under the GFN procedures. 18 CFR § 270.201(h) (1988). To facilitate this change of service—from interstate transportation *and* sale to *transportation only*—the Commission provides a "blanket" certificate. This Court's opinion holds this to be unauthorized as imposing "common carrier" responsibilities on the unwilling or reluctant pipeline. Essentially these same arguments were presented and rejected by the D.C. Circuit in the attack on the Commission's "open access" rules in its celebrated *Associated Gas Distributors* case.[13] After first discussing the pertinence of §§ 5, 7, and 16 of the NGA that Court continued, there is "no language in the

producers from obtaining those prices by insisting on continuation of the present price. R. 7315.

**11.** Nor is the Commission's rejection of decisions under the Interstate Commerce Act (ICC) faulty.

**12.** In addition, requiring individual producers to file abandonment applications and considering those applications on a case-by-case basis is an inadequate solution. That would cause lengthy delays before abandonments could be granted, given the vast number of

producers in the nation and the Commission's limited resources. Achievement of the goals of increased production and lower overall prices would thereby be substantially delayed. Thus, granting abandonment in the present proceeding, if the conditions set forth in the Good Faith Negotiation rule are met, is in the interest of the natural gas market as a whole and is necessary to bring about market-responsive prices for old gas and overall lower prices. R. 7351–52.

**13.** 824 F.2d 981 (D.C.Cir.1987).

NGA barring the Commission from imposing common carrier status on natural gas pipelines, and certainly none barring it from imposing on the pipelines a specific duty that happens to be a typical or even core component of such status." 824 F.2d at 997. That Court found no basis for the attacks on "open access" under either the provisions of NGA or its legislative history, 824 F.2d at 997–1001, or under either the NGPA, 824 F.2d at 1001–03, or the Fifth Circuit's decision in *Florida Power and Light v. FERC*, 660 F.2d 668 (5th Cir. 1981).[14] *See* 824 F.2d at 998–99.

Quite apart from the arguments on common carrier status, the Court's opinion errs in disapproving the Commission's order.

First, there seems to be a major misconception. The Commission imposed no new "mandatory" transportation obligation at all. Rather, the Commission required only "a continuation of the pipeline's existing service obligation to move gas to market."[15] Theretofore, the pipeline may have been a *merchant* purchasing gas at the wellhead and a *transporter* carrying the gas to its customers. Now, once GFN procedures have failed to result in agreement upon a new price for old gas under existing contracts, the pipeline becomes a *transporter* moving essentially the *same* gas but now purchased by someone else. The critical fact is that the essential transportation service for the same gas to the interstate market remains exactly the same. (R. 7429–30).

Following traditional lines so stressed by the protestants and this Court's opinion, § 7 of the NGA imposes "a continuing regulatory obligation, irrespective of private contractual arrangements, not to abandon any certificated obligations before obtaining authorization from the Commission to

do so." *Panhandle Eastern Pipe Line Co. v. FERC*, 803 F.2d 726, 728 (D.C.Cir. 1986), citing *United Gas Pipe Line Co. v. McCombs*, 442 U.S. 529, 99 S.Ct. 2461, 61 L.Ed.2d 54 (1979). In the light of this, what the Commission requires is nothing more than that the pipeline, choosing to terminate its gas merchant function under GFN, must nevertheless continue to provide its critical transport service.

Finally, as the Commission explains so vividly, (R. 7428–7430), there are practical necessities sustaining the administrative reasonableness of the Commission's action. Not to require the pipeline to continue its transportation service would seriously impair, if not completely undercut, the availability of market-priced gas to the market. It would also offset the consequences of the GFN. Significantly the only interstate pipelines subject to this mandatory transportation are those few non-"open access" pipelines. Whatever the rights of these very few[16] non-"open access" pipelines— none involved here—their rights ought not to pull down the whole house of cards as to those already bound[17] to transport under "open access" requirements.

### Take or Pay Solution not Mandatorily Required

Probably the most startling part of the Court's opinion is its presuming to direct the Commission to consider, and once and for all to *solve*, a matter so perplexing and complex as the issue of take-or-pay contracts.

Granted that it is a serious problem and one which needs a solution if—and the if may be a very big one—it can be solved independently of the ultimate insolvency of major pipeline takers and payers.

---

**14.** This decision if relevantly significant is, of course, binding on me.

**15.** R. 7429 (citation omitted).

**16.** All but two of the twenty-one major pipelines are consensually "open access." *See* n. 34, Court's opinion.

**17.** Ironically, indicating perhaps the simple reflex of opposition by so many to any and every new effort to unscramble natural gas in the fact

that joining the Joint Opponents' briefs are a number of party-pipelines who have accepted "open access." *See, e.g., Transcontinental Gas Pipe Line Corp.,* 43 FERC ¶ 61,196 (1988); *Tennessee Gas Pipeline Co.,* 39 FERC ¶ 61,337 (1987); *Natural Gas Pipeline Co. of America,* 39 FERC ¶ 61,153 (1987); *Williams' Natural Gas Co.,* 43 FERC ¶ 62,171 (1988); and *ANR Pipeline Co.,* 44 FERC ¶ 61,126 (1988).

As this very Court has recognized in rejecting similar arguments, the take-or-pay issue is a discreet matter, "which is being addressed in other proceedings before the Commission and through other means." *Transwestern Pipeline Co. v. FERC*, 820 F.2d 733, 744 (5th Cir.1987).[18]

Indeed, the demand that the Commission—under penalty of forfeiting its judgmental conclusion on increased price for old gas, abandonment and mandatory transportation—consider and then solve this problem of which Congress has been acutely aware, and has similarly ducked, is, most charitably, audacious. So audacious is it that it approaches a similar demand by some court someplace that either Congress or the Department of Defense solve the problem of terrorism as a condition to appropriating funds for the maintenance and upkeep of the prisoner stockade at Fort Sam Houston, Texas.

This is contrary to the demands not only of administrative law, but of the review of legislation, state or federal. The Supreme Court has long recognized that "[e]vils in the same field may be of different dimensions and proportions, requiring different remedies.... [O]r the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *see also Schweiker v. Wilson*, 450 U.S. 221, 238, 101 S.Ct. 1074, 1084, 67 L.Ed.2d 186 (1981).

Additionally, the Commission provides pipelines with the means to address take-or-pay problems within the context of its rulemaking. First, pipelines are given something tangible (higher old gas prices) to bargain against take-or-pay liability. Second, when producers, under GFN, seek to raise an old gas price, pipelines can require the direct renegotiation of the sellers' high-cost gas sales that are being sold under mixed contracts. Third, the pipeline can terminate its contract obligations as to both the old gas and high-cost gas sold under mixed contracts. In short, as the Commission found, the pipelines were given substantial bargaining leverage against producers' uneconomic contracts.[19]

### Tag Ends

Like the Court in its opinion, I find undeserving of specific comment the other attacks on the Commission's 451 Orders.

### Where it All Ends

Committed, as we are, to the Commission's necessitous right of experimentation in a matter so complex and nearly beyond congressional solution, this Court's action in nullifying the 451 Orders is an unauthorized intrusion into a field which neither Article III nor legislation commands.

I therefore, respectfully, dissent.

---

**18.** The Commission's brief advises the Court that the Commission is particularly addressing these issues in the proceedings on remand of *Associated Gas Distributors*, Order No. 500: Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol: Interim Rule and Statement of Policy [Reg. Preambles 1982–1985], III FERC Stats. & Regs. ¶ 30,761 (1987), *modified and reh'g denied*, Order No. 500–B, III FERC Stats. & Regs. ¶ 30,772, *further modified*, Order No. 500–C, III FERC Stats. & Regs. ¶ 30,786 (1987), Order No. 500–D, III FERC Stats & Regs. ¶ 30,800 (March 8, 1988), *reh'g denied*, Order No. 500–E, 43 FERC ¶ 61,234 (May 6, 1988), 53 Fed.Reg. 16,859 (May 12, 1988); petitions for review filed *sub nom, American Gas Association v. FERC*, (D.C.Cir. No. 87–1588).

**19.** The Commission's brief advises that to date under the Commission Order No. 500 series, eight pipelines have reached in the aggregate over $3.9 billion in settlements of take-or-pay liability. *See* Commission's brief, at note 55 (citing specific cases).